Filed 3/30/17 Certified for Publication 5/1/17 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JAMES RAYMOND CLARY, as Personal Representative, et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>CITY OF CRESCENT CITY,<br><br>    Defendant and Respondent. | A143684<br><br>(Del Norte County<br>Super. Ct. No. CVPT 111089) |

John Diehl, while a resident of Washington State, owned eight vacant lots in Crescent City, California (City).[1]  Diehl appeals from the superior court's denial of his petition for a writ of administrative mandate, brought under Code of Civil Procedure section 1094.5.  Diehl's writ petition challenged the City's determinations that the overgrown weeds and rubbish on his lots constitute a public nuisance that required abatement and, when he refused to abate the nuisance, that a lien be placed on his lots for the City's abatement costs.

Diehl has relentlessly asserted that the conditions on his properties, including high growing blackberry bushes, broom plants, other weedy vegetation, abundant trash and illegally dumped material, are not a nuisance.  But what in his eyes is simply "natural

---

[1]  Mr. Diehl passed away after the briefing was completed in this appeal.  He represented himself in the administrative and court proceedings below and in this appeal prior to his passing.  The co-representatives of his estate have continued to pursue this appeal, as reflected in the caption to this opinion, through counsel.  For clarity's sake, we refer to the appellant as "Diehl" throughout this opinion and mean no disrespect by doing so.

1

landscaping" that provides habitat for birds and other wildlife and "a more attractive vista than a lot scraped clean of all trees and bushes" is in the City's view a blight, a habitat for rats and vermin and an attractive nuisance.

Having carefully considered Diehl's lengthy briefs and many arguments, we conclude the City acted lawfully and therefore affirm.

## BACKGROUND

Diehl acquired his eight vacant lots (the Properties) in 1998 through foreclosure after the prior owner defaulted on a loan Diehl had made. One lot is paved and the other seven are covered with vegetation.

A local ordinance prohibits, and declares a public nuisance, various conditions on property within the City, including "[o]vergrown, dead, decayed or hazardous vegetation" which "[m]ay harbor rats, vermin or other disease carriers," "[i]s an obstruction to the vision of motorists or a hazardous condition to pedestrians or vehicle traffic," "[c]onstitutes an unsightly appearance" or "[c]onstitutes an attractive nuisance." (Crescent City Mun. Code, § 8.08.020 (the Ordinance), subd. (H).)

In May 2010, the City, through its code enforcement officer Eric Taylor (Taylor), served notice by letter to Diehl in Washington State that there was a nuisance on his properties, specifically, a violation of the above-quoted subdivision H of the Ordinance. The letter informed Diehl he was required to cut back, mow or till under the vegetation and that if he did not do so formal abatement procedures or the filing of a criminal nuisance complaint would ensue.

In June 2010, Diehl wrote back to the City questioning its determination that conditions listed in subdivision H existed on the Properties and requesting evidence of the same. He asserted his intention "to allow natural vegetation to flourish on my properties until they are sold for development," and that the Properties possessed "a natural beauty," "provide[d] . . . shelter and foraging habitat for birds and other wildlife," and "contribute[d] a mite to controlling storm water runoff and replacing carbon dioxide

2

with oxygen in the atmosphere." In July,[2] August and October 2010, the City sent similar notices to Diehl, each time demanding that he abate the nuisance within seven days of receipt of the notice and warning that if he did not, abatement proceedings and/or a criminal nuisance complaint would ensue.

In September 2010, at Taylor's request, the City's fire chief inspected the Properties. The fire chief prepared a notice to Diehl that his properties were in violation of California Fire Code section 304, which prohibits accumulation of combustible waste material creating a fire hazard upon premises, prohibits accumulation of, among other things, weeds and litter, on various kinds of properties including vacant lots, and requires removal of "[w]eeds, grass, vines or other growth that is capable of being ignited and endangering property." The fire chief further advised Diehl that his properties had "large amounts of wastepaper that has blown in underneath the brush" and "significant dead vegetation that is underneath the green vegetation," and that these conditions created "a significant fire hazard and can aid in the rapid development of a large fire in these locations." The fire chief reminded Diehl that "our most significant fire season in Del Norte County is late September thru late October" and stated the Properties needed to be cleaned up immediately. He stated that further notice would be in the form of a citation accompanied by fines starting at $100 per day.

Taylor also asked a Del Norte County environmental health scientist to visit the Properties. The Department of Community Development, Engineering and Environmental Health for the County of Del Norte notified Diehl by letter that it had received "some complaints about the accumulation of an abundance of wild plants, garbage, refuse accumulation and wild animal harborage" on one of his lots. The letter also noted a state regulatory requirement requiring "putrescible wastes be removed from premises at least every seven (7) days," and stated that the condition of the Properties

---

[2] In July 2010, the City issued a citation with a fine to Diehl, who paid it and requested an administrative hearing. When the City did not timely schedule a hearing, Diehl demanded the return of his check and threatened litigation. The City returned the check and voided the citation.

"attracts wild animals, vermin and other vectors of disease, as well as constitutes a nuisance" under the Del Norte County Code. The letter further stated that the accumulated plants and refuse "must be removed from this site" prior to November 1, 2010, and that further accumulation would result in fines. It also warned that "harborage of wild animals and vermin can jeopardize the health, safety and general welfare of the community" and referred him to animal control services.

Taylor included the fire chief's and County Environmental Health Department's notices with the City's October 2010 notice when he sent it to Diehl. In a November 2, 2010 letter, Diehl wrote to the City stating he had asked a retired fire chief to inspect his properties and that individual "reported that he saw nothing he considered a nuisance condition."

On receiving Diehl's letter, Taylor sent photos of the blackberry vines and brush on the Properties to the California Department of Fish and Game, which informed him that the vines were Himalayan Blackberries and the majority of the brush at the Properties was either French Broom or Scotch Broom, both of which were "non native and extremely invasive," and that it encouraged removal of invasive species because they "outcompete and destroy native habitat."

Taylor sent a final notice to Diehl on November 11, 2010, and on January 21, 2011, sent him a notice of a public hearing regarding the conditions on the Properties. Three days before this public hearing, Diehl stated he was unable to attend, requested a continuance and submitted a written response to the nuisance allegations, including a declaration and eight pages of legal arguments. However, Taylor reported to the Crescent City City Council (City Council), Diehl did not make "any effort to cut back the overgrown vegetation on [the Properties]."

At the public hearing on February 7, 2011, Diehl did not appear. Taylor testified under oath and submitted photographs depicting the lots containing brown patches of dead vegetation, an accumulation of trash, weeds and illegally dumped materials, blackberry vines and Scotch or French broom. The photographs depicted the height of the vegetation, which was described as "several feet high." Taylor testified that one of

4

the lots, across from North Valley Bank, was "of particular concern because there are a lot of foot paths and trails going in there, so seems like it's being used quite a bit, for whatever purposes, I don't know." Taylor testified that he had gone out and seen this site, and had initiated this nuisance proceeding himself, and that after initiating it he had received two complaints. Admitted into evidence were Taylor's testimony, his report with the attached photographs, the letters of the fire chief and County Environmental Health Department to Diehl, the emails from the Department of Fish and Game to Taylor and Diehl's written submission to the City Council. At the conclusion of the hearing, the City Council found, based on this evidence, that there was a nuisance and that the each of the four criteria in subdivision (H) of the Ordinance had been established.

On February 14, 2011, the City served notice of the determination on Diehl, providing him 30 days to abate the nuisance by cutting back, mowing or tilling under the vegetation on the Properties or to seek judicial review of the determination.

On March 14, 2011, Diehl filed his verified petition for writ of mandate in the superior court. In August 2011, the City filed the administrative record and an answer to the petition. In September 2011, Diehl filed a request to file an oversized brief, which he submitted with the request.

In November 2011, the City received another complaint about one of Diehl's lots from a person working at the nearby bank alleging the lot had "Scotch Broom over 6' tall," and was both "a fire danger" and "a danger to staff because homeless are living there." The complaint asserted that "[t]he Scotch Broom causes allergy problems" and "makes the City look ugly."

On February 6, 2012, the City Council considered a resolution recommended by Taylor and the city manager to declare Diehl's and two other property owners' properties a nuisance under Government Code section 39560 et seq. Such a resolution would enable the City to declare that the properties' weeds were a seasonal and recurrent nuisance and their rubbish was a nuisance and, after providing notice to the property owners, re-enter the properties and abate any subsequent occurrences in the same year without holding another public hearing. The City Council adopted the resolution. It set

5

the date of the public hearing for February 21, 2012, and directed the clerk to give notice of the hearing to the property owners. Taylor provided notice to Diehl that the City intended to proceed with abatement and levy its abatement costs against Diehl.

Diehl again did not appear at the February 21, 2012 hearing. He apparently attempted to submit written testimony by fax late that day, but it was not received in time to be considered. At the hearing, Taylor stated that nothing had changed since February 6, the Properties remained in the same condition, and he had provided notice to the property owners and received no response. He again showed photographs of vegetation on Diehl's properties encroaching on the right of way and near buildings on neighboring properties, and said if the vegetation caught fire in the very dry summer months it could pose a risk to neighboring properties. He also said he had received multiple complaints, and some were concerned they would experience allergies to Scotch Broom pollen in the approaching spring.

The City Council voted to find there was a nuisance on the Properties, to uphold the findings made in the February 6, 2012 resolution and to direct staff to seek estimates and proceed with abatement. Taylor gave notice of this determination to Diehl by email on March 6, 2012, and informed him that the City Council had confirmed its previous determination and directed staff to commence with abatement. He also stated that the City would retain a contractor to mow the lots and remove the rubbish and dispose of all waste, that the City had received estimates ranging from $485 to $4,200 and that the cost of abatement would be placed as a lien on the Properties and collected with ordinary property taxes. Taylor informed Diehl he had one week to complete the abatement before the City proceeded with its abatement.

Sometime prior to May 1, 2012, the City sent Diehl notice of a weed and rubbish abatement cost report and notice of a hearing on that matter set for May 7, 2012. Diehl did not appear, but faxed written objection to the City—again on the same day as the hearing. City Council members were provided copies of his testimony when they arrived at the hearing.

At the May 7 hearing, Taylor stated that City staff received four bids for the abatement services and chose the bidder they thought was the best and most reliable. The contractor abated the nuisances by mowing the weeds, removing the rubbish and disposing of it at a dump site. About 12 dump truck loads and over 1000 pounds of trash were removed from the Properties, some of it from homeless encampments. Staff had taken the cost for staff time and legal time and allocated it equally among all of Diehl's parcels, and had apportioned the abatement costs among the parcels in accordance with their relative sizes. Taylor recommended the City Council approve the report, and said the county auditor could then add the assessment to the next regular tax bill levied against the Properties.

There was also testimony that the Properties posed significant hazards. Taylor said the City had received comments from businesses neighboring the Properties that their staff did not feel safe going to their cars at night. The fire chief said the Properties posed a fire hazard and that a recent brush pile burned on another property and "ran up" a hill burning an area of about 10 feet by 40 feet of "wet brush." The trash on the Diehl's properties alone would burn them up. "It was full of all kinds of paper, anything that would blow in there, for years." Further, the City "probably put out 10 or 20 homeless encampment fires every year." "So any brush patch around town that somebody can hide in has burned at one time or another. So it's definitely a fire hazard."

At the request of City Council members, the City's attorney went through the points raised in Diehl's written objections. In regard to his argument that the concern about rats and vermin was "a myth," she stated she heard that when the brush was being removed there were "large populations of vermin that scattered in all directions." Invoices submitted by the contractor for cutting the brush on the Properties stated that the Properties had "excessive trash" "rats (vermin)" and "evidence of several homeless camps." Taylor's report also included photographs showing the weeds, as well as trash, sleeping bags and other evidence of homeless encampments. The City Council adopted the abatement report providing that the costs of abatement would constitute a special assessment on the Properties.

7

For two-and-a-half years Diehl made no effort to move his superior court writ proceeding forward. In December 2013, he filed a motion to amend and a proposed first amended petition that added challenges to the 2012 nuisance abatement and assessment proceedings, which the City did not oppose. The court granted it, accepted the oversized brief Diehl had filed in 2011, directed the City to supplement the administrative record by a specified date, and set dates for the parties' further briefing. Diehl filed his response brief two months late, after the City had filed its own brief. He also submitted an unauthorized "reply brief" and a motion to supplement the administrative record. The City objected to the motion to supplement on the grounds that the documents were outside the administrative record, and objected to Diehl's filings.

On September 23, 2014, the City requested a case management conference. Instead of setting a conference, the court on September 29, 2014, denied the petition in a written "opinion" and directed the City to submit a proposed form of judgment. The court entered judgment on October 9, 2014. Subsequently, Diehl filed a request for a statement of decision, a motion to disqualify the judge for cause and a response to the City's objection to his late-filed memorandum. The court denied Diehl's motion to disqualify as untimely. Diehl also filed a motion for new trial, which was denied by operation of law 60 days after the City filed its notice of entry of judgment. (Code Civ. Proc., § 660) On December 5, 2014, Diehl filed the notice of appeal from the judgment.

## DISCUSSION

Diehl raises a plethora of issues in contending that we must reverse the superior court's ruling. We shall discuss them in three categories: legal challenges to the City's determinations; claims of procedural irregularities in the superior court; and other contentions of superior court error. But first, we address our standard of review.

## I.

### *Standard of Review*

As both parties recognize, the writ Diehl sought below, the denial of which he now appeals, is a writ of administrative mandate governed by Code of Civil Procedure section 1094.5 (section 1094.5)—challenging the rulings of the City Council regarding

8

the condition of the Properties. The scope of the superior court's inquiry under section 1094.5 was limited to whether the City Council acted without or in excess of its jurisdiction, denied Diehl a fair trial or abused its discretion in a manner that was prejudicial. (§ 1094.5, subd. (b).) Abuse of discretion is established if the agency "has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (*Ibid*.)

Under Code of Civil Procedure section 1094.5, there are two alternative standards of review that a superior court uses to review a petition for writ of administrative mandamus. (*JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1056–1057 (*JKH Enterprises*).) "If the administrative decision involved or substantially affected a 'fundamental vested right,' the superior court exercises its independent judgment upon the evidence disclosed in a limited trial de novo in which the court must examine the administrative record for errors of law and exercise its independent judgment upon the evidence." (*Id.* at p. 1057.) "Where no fundamental vested right is involved, the superior court's review is limited to examining the administrative record to determine whether the adjudicatory decision and its findings are supported by substantial evidence in light of the whole record." (*Ibid*.)

Diehl provides no authority suggesting that the City's application of local and state nuisance laws to declare the overgrown weeds and trash on his lots a public nuisance, require that the vegetation be mowed and the trash removed, and impose on him the City's abatement costs implicate fundamental vested rights. Therefore, the substantial evidence standard applied below. We also note that much more significant burdens have been held not to abridge fundamental rights. " 'The substantial evidence test has been applied to review administrative decisions that restrict a property owner's return on his property, or which increase the cost of doing business, or reduce profits, because such decisions impact mere economic interests rather than fundamental vested rights. [Citations.] [¶] In contrast, the independent judgment test is applied to review administrative decisions that will drive an owner out of business or significantly injure

9

the business's ability to function. [Citations.]' " (*Benetatos v. City of Los Angeles* (2015) 235 Cal.App.4th 1270, 1281 (*Benetatos*).)[3]

Regardless of the standard of review that applied in the trial court, appellate courts apply a substantial evidence standard. (*JKH Enterprises*, *supra*, 142 Cal.App.4th at p. 1058.) Because the superior court applied the substantial evidence test, our review is the same as the superior court's: we review the administrative record to determine whether substantial evidence supports the City Council's decision, resolving all conflicts in the evidence and drawing all inferences in support of the City's findings. (*Benetatos*, *supra*, 235 Cal.App.4th at p. 1281.)

Diehl, as the petitioner, had the burden to demonstrate that the City Council's decision was invalid and should be set aside, because we presume that the City Council regularly performed its official duty. (See *Desmond v. County of Contra Costa* (1993) 21 Cal.App.4th 330, 335.) He must shoulder this burden both in the superior court and in this court. (*Id.* at pp. 335–336.)

## II.

### *Diehl's Legal Challenges to the City's Determinations*

#### A.  The City Was Not Estopped or Barred by Laches from Enforcing the Nuisance Laws Against Diehl.

Diehl contends that the City was "estopped by acquiescence" or barred by laches from enforcing the Ordinance and state nuisance statutes against him, based on three incidents. In 2002, in response to the City's request that he remove vegetation on one of his lots, Diehl denied it was a fire hazard and the city manager agreed that cutting back vegetation encroaching on the sidewalk would suffice; in 2005, the City filed a criminal complaint claiming the vegetation was a public nuisance and was in violation of the

---

[3] Diehl incorrectly contends that whenever a due process violation is asserted, the courts exercise independent judgment in reviewing the evidence. The standard of review applied *to issues of fact* in section 1094.5 writ proceedings depends not on the arguments the petitioner makes but on the rights involved. (See *Benetatos*, *supra*, 235 Cal.App.4th at p. 1280.) Of course, issues of *law* are subject to independent review. (See *JKH Enterprises*, *supra*, 142 Cal.App.4th at pp. 1058–1059.)

Ordinance; and in 2007, according to Diehl, the City "voluntarily dropped" its nuisance complaints while his motion for dismissal challenging the Ordinance on vagueness grounds was pending.[4] His arguments are unpersuasive.

Estoppel against the government may be applied "only in the most extraordinary case where the injustice is great and the precedent set by the estoppel is narrow." (*Smith v. County of Santa Barbara* (1992) 7 Cal.App.4th 770, 775.) Further, one of the elements Diehl must show to establish that estoppel should apply includes detrimental reliance by him on the City's conduct. (*Schafer v. City of Los Angeles* (2015) 237 Cal.App.4th 1250, 1261 [party claiming estoppel " 'must rely upon the conduct to his injury' "]; see *Smith*, at pp. 775, 776–777.) "The detrimental reliance must be reasonable." (*Schafer*, at p. 1261.)

Diehl's estoppel argument fails because he has not shown or explained how he relied on any of the acts he attributes to the City to his own detriment; nor has he established any "grave injustice." At most, one may infer from his declaration that when the City failed to take further action against him in 2002, 2005 and 2007, he continued to allow the vegetation on his lots to grow unchecked. He does not suggest that he trimmed it back periodically, or took any steps at all to maintain the Properties, much less that he expended any funds in doing so. Instead, he claims he was subjected to "unjust harassment" at the City's hands "for the past decade," and spent time and money to defend himself against the nuisance proceedings. He cites nothing in the record supporting this assertion, but even if it were supported, it would not establish either detrimental reliance or injustice. Spending time and funds to defend against the City's complaints about the Properties can hardly be characterized as reliance on the City's *failure* to act. Rather, such expenditures were the result of the fact that the City did act, even if it did not follow the process through to its conclusion until the instant occasion.

---

[4] A City Council member who was present when the matter was concluded disagreed with this characterization, stating "Mr. Diehl, uh, he stretches the truth a lot where he said it was dismissed. Those charges against his building where [*sic*] dismissed in the court because a buyer bought the building and cleaned it up, or he would've been responsible for it."

For similar reasons, Diehl's laches argument likewise fails. " ' "Laches is an equitable defense based on the principle that those who neglect their rights may be barred from obtaining relief in equity. [Citation.] ' "The defense of laches requires unreasonable delay plus either acquiescence in the act about which the plaintiff complains or prejudice to the defendant resulting from the delay." ' [Citation.] [¶] Laches is a question of fact for the trial court, but may be decided as a matter of law where, as here, the relevant facts are undisputed. [Citation.]" [Citation.]' [Citation.] '[A]s with estoppel, laches is not available where it would nullify an important policy adopted for the benefit of the public. [Citations.]' " (*Golden Gate Water Ski Club v. County of Contra Costa* (2008) 165 Cal.App.4th 249, 263.) The Ordinance serves important public policies relating to the health and safety of City residents and visitors and the elimination of blight. If the City's failure to enforce the Ordinance consistently barred it from ever doing so, those policies would be undermined. On the other hand, Diehl has shown no detrimental reliance or prejudice resulting from the City's inconsistent enforcement that would justify overriding these public policies.

## B. Diehl Has Not Shown the Ordinance As Applied to His Properties Was Unconstitutionally Vague.

Diehl contends the Ordinance is unconstitutionally vague because the phrase "unsightly appearance" is "subjective and does not provide a reasonable person a standard by which he can determine whether his property has crossed the line and become in violation of" the Ordinance. This argument is premised on a false assertion. Diehl mis-describes the Ordinance as "set[ting] forth a conjunction of four criteria that establish [a nuisance condition with respect to overgrown or decayed vegetation]" and purports to quote those criteria thusly: " '(1) that it may harbor rats, vermin, and other disease carriers; (2) that it obstructs the vision of motorists or creates a hazardous condition for pedestrians or vehicle traffic; (3) that it constitutes an unsightly appearance; **and** (4) that it constitutes an attractive nuisance.' " In fact, the "and" Diehl inserted in bold between the third and fourth criteria nowhere appears in the ordinance, including as it is quoted in City's Notice of Determination to which Diehl cites.

12

Such a misquotation of the law is inexcusable and places additional burdens on the court.  (See *Biancalana v. Fleming* (1996) 45 Cal.App.4th 698, 701, fn. 2.)  As the leading treatise on appellate practice points out "[m]isstatements, misrepresentations and/or material omissions of the relevant facts or law can instantly 'undo' an otherwise effective brief, waiving issues and arguments; it will certainly cast doubt on your credibility, may draw *sanctions* [citation] and may well cause you to *lose the case*!'" (Eisenberg et al., Cal. Practice Guide, Civil Appeals and Writs (The Rutter Group 2016) ¶ 9:27, p. 9-8.)  We reject Diehl's contention that all four criteria must be met to establish a nuisance under the ordinance based on his insertion of the word "and," which the City could have, but did not, include in the actual ordinance.[5]  Thus, even if the "unsightly appearance" language were deemed unconstitutionally vague, the Ordinance as applied to him would not fall because the City Council found all four of the criteria were met in this case.

We also disagree that "unsightly appearance" in the context of the other relevant terms of the ordinance, i.e., "[o]vergrown, dead, decayed or hazardous vegetation," is unconstitutionally vague.  The unsightliness of large overgrown lots full of weeds, especially in urban settings, presumably is at least in part what led the state to authorize local governments to declare as nuisances and abate weed-ridden properties (see Gov. Code, §§ 39501–39502, 39561–39588), and what led local governments to do so.  (See *Roth v. City of Los Angeles* (1975) 53 Cal.App.3d 679; *Thain v. City of Palo*

_____

[5]  The Ordinance actually provides in relevant part:  "8.08.020 - Prohibited Nuisances. [¶] It shall be unlawful, and it is hereby declared to be a public nuisance, for any person owning, leasing, occupying or having charge of any residential, agricultural, commercial, industrial, business park, office, educational, religious, vacant or other property within the city of Crescent City, to maintain such premises in such a manner that any one or more of the conditions or activities described in the following subsections are found to exist: [¶] . . . [¶] (H)  Overgrown, dead, decayed or hazardous vegetation which:
"1.  May harbor rats, vermin or other disease carriers;
"2.  Is an obstruction to the vision of motorists or a hazardous condition to pedestrians or vehicle traffic;
"3.  Constitutes an unsightly appearance;
"4.  Constitutes an attractive nuisance."

13

*Alto* (1962) 207 Cal.App.2d 173.)  In *Thain*, this court upheld against a vagueness challenge a city weed ordinance that prohibited landowners from permitting weeds to remain on their premises or adjacent sidewalks, streets or alleys.  The ordinance defined "weeds" to mean " 'all weeds growing upon streets, alleys, sidewalks, or private property' including weeds which bear or may bear seeds of a downy or wingy nature, weeds and grasses which may attain such large growth as to become, when dry, a fire menace, weeds otherwise noxious or dangerous, poison oak and poison ivy in a condition of growth constituting a menace to public health, and accumulations of refuse, cuttings and other combustible trash."  (*Thain*, at pp. 177, 188.)  We concluded that due process "requirements of certainty and definiteness are met in the instant case.  The words 'weeds,' 'indigenous grasses,' 'poison oak,' 'poison ivy,' 'refuse' and 'trash' are all words of common meaning which are easily understood by the average citizen.  The definition of 'weeds' in section 32.01 can be understood with reasonable certainty.  The ordinance also makes it clear that the proscribed weeds, if not removed by the property owner, are, under section 32.02, to be ordered abated by destruction or removal.  There is nothing vague about these provisions."  (*Id*. at p. 188, fn. omitted.)  The same is true here, where the Ordinance is, indeed, more specific than the one we upheld in *Thain*.  It addresses not all weeds or vegetation, but only that which is "[o]vergrown, dead, decayed or hazardous."  The average citizen can easily understand what is meant by overgrown vegetation that "constitutes an unsightly appearance."

### C. Diehl Has Shown No Conflict Between the Ordinance or State Nuisance Statute and the Civil Code Definition of Nuisance.

Diehl's next contention is that subdivision (H) of the Ordinance, "[a]t least as interpreted and applied by the City," is so "vague and overly broad" that it conflicts with Civil Code section 3479.  Again, we disagree.

Civil Code section 3479, among other things, defines as a "nuisance" "[a]nything which is injurious to health . . . or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner" of

14

waterways, streets and highways, and public parks and squares. Government Code section 38771 provides: "By ordinance the city legislative body may declare what constitutes a nuisance."

The California Supreme Court held in *City of Bakersfield v. Miller* (1966) 64 Cal.2d 93, that state laws more specific than Civil Code section 3479 defining certain nuisances with greater particularity—there a state housing regulation—do not define the limits of what may be declared a nuisance under municipal law. The court held that "[Government Code] section 38771 does more than permit cities to adopt as municipal ordinances provisions which have already been enacted as state statutes; such an interpretation would make the section superfluous." (*City of Bakersfield*, at p. 100.) The court stopped short of deciding whether "section [38771] delegates to municipalities only the power to declare as nuisances specific conditions within the general areas of regulation enumerated in Civil Code section 3479," because the fire hazard addressed by the Bakersfield ordinance clearly fell within the definition in section 3479. (*Ibid.*)

The City urges us to decide that question, citing *Golden Gate Water Ski Club v. County of Contra Costa*, *supra*, 165 Cal.App.4th 249. In that case, Division One of this court held that article XI, section 7 of the California Constitution, establishing local governments' police powers, provides local governments with authority to impose and enforce land use regulations, through a nuisance ordinance or otherwise, without regard to whether the prohibited use falls within the Civil Code definition of nuisance. (See *Golden Gate Water Ski Club*, at pp. 255–256.) We agree with the City that *Golden Gate Water Ski Club* is dispositive here. There can be no doubt that the City's police powers are broad enough to encompass aesthetic concerns. (See *Metromedia, Inc. v. City of San Diego* (1980) 26 Cal.3d 848, 860 [improving appearance of community falls within city's authority under the police power], revd. on other grounds in *Metromedia, Inc. v. City of San Diego* (1981) 453 U.S. 490, 507–508 [affirming that appearance of city is a substantial government goal]; *Kucera v. Lizza* (1997) 59 Cal.App.4th 1141, 1148–1149 [" 'It is well settled that the state may legitimately exercise its police powers to advance aesthetic values' "].)

15

Further, we do not agree with Diehl that the overgrown vegetation defined as a nuisance under the Ordinance falls outside the definition of nuisance in Civil Code section 3479. The language of section 3479 is broad, and covers "[a]nything which is . . . indecent or offensive to the senses." This language extends to conditions that involve aesthetic considerations. Further, the conditions addressed by subdivision (H) of the Ordinance address health and safety concerns as well. These subjects are included in section 3479: "[a]nything which is injurious to health."

Nor do we agree with Diehl's argument that his weed-infested lots were not bad enough to constitute a public nuisance. He cites the Restatement Second of Torts and Civil Code sections 3480 and 3481 for the proposition that a nuisance must affect " 'an entire community or neighborhood, or [a] considerable number of persons' " to constitute a public nuisance and likens his weed-infested lots with "anything deemed unkempt," such as uncombed or long hair that may be deemed a nuisance "because a few people find it ugly." There is simply no comparison between the two. Both concern aesthetics, to be sure, but only one is likely, as one member of the public pointed out during the public comment period, to be seen by everyone who drives through the City and give a negative impression to all who visit, and only one is likely to drive down property values in the area. Further, the City's adoption of a weed abatement law demonstrates conclusively that the aesthetic concern about conditions such as those on Diehl's properties is widely shared within Crescent City—not limited to "a few people" as Diehl surmises. As this court observed in *Disney v. City of Concord* (2011) 194 Cal.App.4th 1410 in upholding an ordinance that prohibited storage and parking of recreational vehicles in driveways and front yards: " 'Blight' may be in the eye of the beholder, but the aesthetic concerns underlying [the ordinance] are widely shared and we have no basis to question their legitimacy." (*Id.* at p. 1416.)

Finally, Diehl's contention that the health and safety concerns underlying the City's nuisance law were based on "speculat[ion] about the possibility of rats living there" again misses the mark. The Ordinance recognizes that vacant lots filled with overgrown vegetation "[m]ay harbor rats [or] vermin," and the City concluded that was

16

the case here. Given the significant amount of trash that found its way into the brambles and weeds on the Properties as evidenced in the photographs presented to the City Council, the possible presence of rats on the Properties was hardly speculative. The City's concern about rats and vermin was manifestly reasonable, even before the lots were cleared of weeds and trash and the actual presence of "ALOT OF RATS(VERMIN)" [*sic*] was observed by the contractor.

**D. Diehl's Contentions That the City's Application of the State Nuisance Abatement Law Conflicted with the Civil Code and Violated Constitutional Vagueness Norms Are Without Merit.**

Turning his attention to the City's 2012 proceedings under the nuisance abatement statute codified at Government Code section 39560 et seq., Diehl repeats his arguments that the City's application of the Government Code weed and rubbish abatement laws violated constitutional proscriptions on vagueness and conflicted with the Civil Code definition of nuisance. These arguments are no more persuasive in this context than they are regarding the City's application of its own Ordinance.

Government Code section 39561 permits a local legislative body to declare by resolution as a public nuisance, and abate: "(a) All weeds growing upon the streets, sidewalks, or private property in the city [and] (b) All rubbish, refuse, and dirt upon parkways, sidewalks, or private property in the city." Section 39561.5 defines "[w]eeds" to include "[w]eeds which bear seeds of a downy or wingy nature," "[s]agebrush, chaparral, and any other brush or weeds which attain such large growth as to become, when dry, a fire menace to adjacent improved property," "[w]eeds which are otherwise noxious or dangerous," "[p]oison oak and poison ivy when the conditions of growth are such as to constitute a menace to the public health," and "[d]ry grass, stubble, brush, litter, or other flammable material which endangers the public safety by creating a fire hazard."

Diehl contends that Government Code section 39561 is too broad, sets no threshold and could be read to allow a nuisance to be declared as to "a single dandelion on a lawn." We give a statute a "reasonable and practical construction" and apply

17

"common sense" in assessing claims of overbreadth or vagueness. (*Personal Watercraft Coalition v. Marin County Bd. of Supervisors* (2002) 100 Cal.App.4th 129, 138–139.) Further, "[i]t is the salutary rule that a person to whom a statute is constitutionally applied in conformity with its obvious purpose may not be heard to challenge its constitutionality on the ground that, conceivably, it might be applied in an unreasonable and absurd manner as to others." (*Findley v. Justice Court* (1976) 62 Cal.App.3d 566, 573.) This rule precludes Diehl's reliance on the "one dandelion" argument here. His interpretation is not reasonable, particularly given the reference to "weeds" in the plural and the definition's focus on weeds that attain a large growth or are of a kind that pose a health or fire hazard. Further, even Diehl concedes that reading Government Code section 39561 in conjunction with the Civil Code definition of a nuisance mitigates any concern about overbreadth. With that, at least, we can agree.[6]

But Diehl again goes awry in asserting that the City had no substantial evidence that the vegetation or litter on his lots met the standards of the Civil Code. He reads Civil Code section 3749 to mean that the conditions on the Properties must be "injurious to public health" and contends there was no evidence that the vegetation and rubbish on his lots met this standard. He is wrong on both counts.

Civil Code section 3479 includes in its definition "[a]nything which is injurious to public health, including, but not limited to, the illegal sale of controlled substances, *or is indecent or offensive to the senses*, or an obstruction to the free use of property, so as to

---

[6] Diehl also argues that other, similar lots in the City contained the "[s]ame amounts and kinds of vegetation as were on [his] vacant lots" but were not subjected to abatement proceedings, showing the Government Code weed and rubbish abatement provisions are too vague to meet constitutional requirements. The meager evidence he submitted in support of this contention, two photographs he declared were of a county equipment yard in "a weedy condition" and the declaration of a Dennis Gill attaching two photographs that purport to show other properties in Crescent City that "are conspicuous and clearly vegetated with many weeds", does not draw a meaningful comparison to the conditions on his properties nor show that the City had jurisdiction to declare a nuisance as to the county property or that it failed to take action as to the properties depicted in the Gill photographs. Thus, he does not show the City applied the Government Code in an inconsistent or arbitrary manner.

interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway . . . ." (Italics added.) Thus, something may be a nuisance without being "injurious to public health" under the Civil Code definition so long as it falls within one of the other categories listed. "[I]ndecent or offensive to the senses" is sufficiently broad to cover conditions that constitute an eyesore, as well as offensive odors, excessive noise and other assaults on the senses. (*Judson v. Los Angeles Suburban Gas Co.* (1910) 157 Cal. 168, 171 ["[I]t is not necessary that the health of plaintiff or of members of his household should have been impaired. It is sufficient if the odors, sounds, and smoke were offensive to the senses"]; see *Flahive v. City of Dana Point* (1999) 72 Cal.App.4th 241, 244 [violating a prohibition on converting off-street parking facilities to other uses was a public nuisance in part because it would "create an eyesore" on city streets].)

Also, not only was there substantial evidence that the condition of Diehl's properties was a blight, and thus "offensive to the senses" within the meaning of Civil Code section 3479, there was also substantial evidence that the overgrown vegetation *was* injurious to public health. As we have stated, there was evidence that the Properties were a magnet for all kinds of trash and thus were likely to attract rodents. A law that seeks to prevent conditions conducive to the presence of rodents is aimed at protecting public health, which is a valid legislative objective. (*People v. Tufts* (1979) 97 Cal.App.3d Supp. 37, 48; see also *Cantrell v. Board of Supervisors* (1948) 87 Cal.App.2d 471, 477 [board could take judicial notice of fact that presence of large numbers of rats and flies is extremely detrimental to health of public as a scientific fact that is commonly recognized].) There was also evidence that the overgrown vegetation posed a fire hazard, another threat to public health and safety.

**E. Diehl's Contention That the City Erred in Its Application of the State Nuisance Abatement Law by Not Stating the Vegetation on His Properties Required Chemical Control Is Frivolous.**

Diehl contends the City failed to comply with Government Code section 39562.2 by not making a statement about, or engaging in, chemical treatment of his properties. This argument is frivolous.

Section 39561 of the Government Code authorizes a local legislative body to "declare by resolution as public nuisances, and abate: [¶] (a) All weeds growing upon the streets, sidewalks, or private property in the city" [and] [¶] (b) All rubbish, refuse, and dirt upon parkways, sidewalks, or private property in the city." Section 39562.1 further provides that a local legislative body "may also find and declare that weeds on specified parcels of property are seasonal and recurrent nuisances," and, if it does so, abate them repeatedly on subsequent occurrences within the same calendar year without holding further hearings.

Diehl does not contend that the City failed to comply with these requirements. Instead, he cites Government Code section 39562.2, which states that if a local legislative body finds that weeds on specified parcels are "seasonal and recurrent nuisances," it "may provide for the preventive abatement of such seasonal and recurrent nuisance." In such circumstances, it "shall, in addition to containing all other required matters, state that the efficient and economical control of such seasonal and recurrent nuisance requires preventive chemical control of such weeds, weed seeds and weed seedlings and . . . may require preventive chemical control of such nuisance."

These provisions plainly afford a local government authority to engage in several distinct types of weed abatement. It may generally abate weeds and rubbish under Government Code section 39561 if it finds and declares they constitute a nuisance; it may abate weeds multiple times within a single year without more than one hearing under Government Code section 39562.1 if it finds and declares they are a "seasonal and recurrent nuisance," and also engage in "preventive abatement" of weeds using chemical control if it declares the weeds are a "seasonal and recurrent nuisance" and that their "efficient and economical control . . . requires preventive chemical control."

Diehl's argument is in effect that a local government must engage in all forms of abatement if it chooses to do any of them. This is not a plausible reading of these

20

Government Code sections.  The City was not required to use chemical control, and unless it intended to do so (which it evidently did not), it was not required to declare the need for chemical control.

**F. Diehl Has Forfeited the Argument That the City Was Required to Comply with Constitutional Requirements Governing Special Assessments.**

In cases in which an order to abate is issued under the Government Code sections discussed above, the local "legislative body by motion or resolution may further order that a special assessment and lien be imposed pursuant to [s]ection 39577."  (Gov. Code, § 39573.)  Government Code section 39577 provides that the costs of abatement on each parcel and the costs incurred by the responsible agency in enforcing abatement "constitute[] a special assessment against that parcel" and that "a lien attaches on the parcel upon recordation of the order confirming the assessment" except in certain circumstances not relevant here.

Diehl argues that the cost of abating a public nuisance that is imposed by local government on a property owner under Government Code section 39577 is subject to the requirements of article XIII D of the California Constitution, which include notice, a hearing and a vote by owners of affected parcels before imposition of assessments.  (Cal. Const., art. XIII D, §§ 1–6.)

We decline to address Diehl's argument for two reasons.  First, Diehl has selectively quoted California Constitution article XIII D and made conclusory arguments, and he has failed to discuss either of the two key issues his argument raises:  (1) whether a nuisance abatement assessment is a "levy or charge upon real property" within the meaning of article XIII D, section 2, and (2) if so, whether it was imposed "for a special benefit conferred on the real property, within the meaning of that section."  He has not cited or discussed any of the many cases that interpret article XIII D, much less explained how they apply here.  " 'This court is not required to discuss or consider points which are not argued or which are not supported by citation to authorities or the record.' "  (*Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979; see Cal. Rules of Court, rule 8.204(a)(1)(B).)  Second, Diehl did not raise the argument in the abatement

21

proceedings before the City Council. For both of these reasons, Diehl has forfeited the issue. (*Danser v. Public Employees' Retirement System* (2015) 240 Cal.App.4th 885, 891 (*Danser*) [contention waived where not supported with legal analysis and not raised in administrative hearing]; *Southern Cal. Underground Contractors, Inc. v. City of San Diego* (2003) 108 Cal.App.4th 533, 549 (*Underground Contractors*) [issue not raised at administrative hearing may not be raised in later judicial proceedings].)

We also note, without deciding, that Diehl's argument is problematic for at least three reasons. First, it would render the Government Code nuisance abatement provisions meaningless because a nuisance abatement assessment under section 39577 could not be imposed on a property owner unless he or she agreed to its imposition. Second, we have serious doubts that it can be squared with the language of the Constitution. It is true that, as Diehl points out, article XIII D by its terms applies to "all assessments, fees and charges, whether imposed pursuant to state statute or local government charter authority." (Cal. Const., art. XIII D, § 1.) However, it also defines "[a]ssessment" for purposes of that article to mean "any levy or charge upon real property by an agency *for a special benefit conferred on the real property*." (*Id*., § 2, subd. (b), italics added.)[7] Diehl has consistently contended that removal of the overgrown blackberry and broom and other vegetation from the Properties was a detriment, *not* a benefit. And in any event, it can hardly be said that the City imposed the costs of abatement to "confer a benefit" on Diehl's properties; rather, it was acting to enforce the nuisance statutes. Diehl cites no authority that would support a holding that equates abatement of a nuisance with "conferring a benefit" for purposes of article XIII D, and we are aware of none. Third and finally, this definition of "assessment" is specific to article XIII D; it does not establish the meaning of that term for purposes of other laws,

---

[7] Diehl selectively quotes only the second sentence of that definition, stating that "[a]ssessment includes, but is not limited to, 'special assessment,' 'benefit assessment,' 'maintenance assessment' and 'special assessment tax.'" That sentence, however, does not aid his argument, since it modifies "assessment" as defined in the prior sentence.

22

such as Government Code section 39577. (*Howard Jarvis Taxpayers Assn. v. City of San Diego* (1999) 72 Cal.App.4th 230, 236–237.)

### G. Diehl Has Forfeited the Argument That the City Was Required to Comply with Competitive Bidding Statutes.

Diehl argues the abatement assessments against the Properties are invalid because "the City failed to award the contract, as required by Government Code § 39576.5, on the basis of bids let to the lowest bidder" because, while it solicited bids, it did not choose the lowest cost bid. He claims the City paid and charged him $987.50 for work that could have been done under bids of $560 and $780. He has forfeited this claim by failing to first raise it in the City's proceedings.

Moreover, even if Diehl had not forfeited the issue, Government Code section 39576.5 states that abatement "may in the discretion of the legislative body be performed by contract awarded by the legislative body on the basis of the lowest responsible bidder pursuant to" a series of sections of the Government Code that have since been repealed. The City's attorney stated at the public hearing that in choosing the contractor, they used the City's procedure for small contracts, soliciting bids, receiving four, and choosing the contract that "appeared to have the right experience, the right equipment; and the price was reasonable." Even if Diehl had not forfeited the issue, he has failed to show that the process used by the City was in conflict with section 39576.5 because he fails to provide any information about the processes authorized by the repealed sections referred to in that section, or explain how section 39576.5 should be interpreted in light of the repealing of those sections.

Diehl also complains that the same section and another Government Code section required the contractor to keep an "itemized written report for each separate parcel." Again, he did not cite or rely on these sections in his submission to the City and has forfeited the point.

Diehl also complains that the City charged him for removal of "possessions of homeless persons who had camped on the [Properties]" and did not show these were "a nuisance" or "rubbish" and, further, the City mowed down "all vegetation, including

23

small trees" that he contends were not nuisances. These arguments are frivolous. The record, in particular the photographs, amply supports the City's determination that the homeless encampments included an abundance of rubbish and that the homeless encampments were a part of the rubbish problem. Further, Diehl does not cite to anything to support his contention about the alleged improper mowing of vegetation and small trees and, therefore, has forfeited it.

## H. Diehl's Argument That the City Exceeded Its Jurisdiction by Instituting the Abatement Proceedings While His Writ Proceeding Was Pending Is Meritless.

Diehl argues that in instituting proceedings to abate the nuisance under the Government Code, the City was in effect reopening or reconsidering the decision it had made a year earlier in its nuisance proceeding under the Ordinance. He contends the City "had no power" to do so "while judicial review was pending" in the writ petition proceeding he initiated in superior court in 2011. He asserts that the 2012 abatement proceedings "amounted to interfering with the jurisdiction of the court" and as such were in excess of the City's jurisdiction. Specifically, he contends that by "preemptively mowing," the City "removed the option of the court to determine that the vegetation had not been shown to be a public nuisance, and therefore might remain intact."

We reject his argument. None of the cases he cites address an agency finding of public nuisance. Unlike a civil service commission decision reinstating an employee, which addresses, as Diehl puts it, "the determination . . . as to the existence of a fact or status which is based upon a present or past group of facts" (see *Heap v. City of Los Angeles* (1936) 6 Cal.2d 405, cited by Diehl), a nuisance can be continuing, can become worse or can be abated in whole or part with the passage of time. The City did not, as Diehl contends, reopen the prior determination that the Properties' condition was a nuisance in 2011 under the Ordinance. It instituted proceedings to determine whether it continued to be a nuisance in 2012 under the Government Code, an issue that was not before the superior court prior to Diehl's 2013 amendment of his petition. The City's

24

purpose for doing so was made plain: it sought to invoke the state statutes that authorized it to abate the nuisance itself if the property owner refused to do so.

Nor did the City's actions interfere with the ongoing writ of mandate proceeding. Notably, Diehl, after filing his petition in 2011, had not noticed a hearing or taken any other steps to move the case forward.[8] And certainly he was entitled to challenge the City's abatement proceedings under state law, which he did by filing his amended petition in December 2013, a year after the City commenced them. If he had desired to prevent abatement while that challenge was pending, he could have filed the amended writ immediately after receiving notice of the City's finding of a nuisance in February 2012, requested a hearing on the amended writ and sought a stay of the City's proceedings until the writ could be heard and decided. He did none of those things.

In any event, we conclude that the City's initiation of abatement proceedings in 2012 did not exceed its jurisdiction or interfere in any way with the jurisdiction of the superior court.

## II.

### *Diehl's Claims of Procedural Irregularities Are Meritless, Non-Prejudicial or Both.*

We now turn to Diehl's challenges to the superior court's review of the City's decisions. As we have already discussed, in reviewing an appeal from a writ proceeding under section 1094.5 in which no fundamental right is involved, "[a]n appellate court's review of the administrative record for legal error and substantial evidence . . . is the same as the superior court's: The appellate court reviews the agency's action, not the superior court's decision; in that sense appellate judicial review . . . is de novo." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427.) The superior court's determination is not binding on this court (*West Chandler Boulevard Neighborhood Assn. v. City of Los Angeles* (2011) 198 Cal.App.4th 1506, 1518); nor do we accord it any deference. (*Davis v. Civil Service Com.* (1997) 55 Cal.App.4th 677, 686.)

---

[8] The City requested a hearing date, but nothing in the record indicates the court set one.

### A.  The Lack of an Oral Hearing Regarding Diehl's Petition

Diehl first argues the superior court erred in failing to conduct an oral hearing on the merits of his petition.  He characterizes its actions as "summarily issu[ing] an 'opinion' " and "ask[ing] the City's counsel to prepare a judgment."  He contends the requirement of section 1094.5, subdivision (a) that a petition for administrative mandamus be "heard by the court sitting without a jury" requires a hearing and that none was provided.

Diehl's argument is unpersuasive for two reasons.  First, he never sought a hearing in the superior court, either regarding his initial petition, which he filed in 2011, or his amended petition, which he filed in 2013 after doing nothing to advance his case for over two years.  After the superior court ordered briefing on his amended petition, Diehl failed to timely file his response brief, instead filing two separate briefs without leave of court two months after the first and only authorized brief was due.  His briefs were unaccompanied by any notice of motion or request for a hearing.  Finally, after the court issued its "opinion" without having held a hearing, Diehl did not request that the court treat it as tentative and allow oral argument.  Instead, he filed a motion to disqualify the judge, claiming the failure to hold oral argument and to rule on Diehl's motion to supplement the record demonstrated bias requiring that the judge be disqualified, and in the alternative requested a statement of decision.  On this record, we conclude the court did not deprive Diehl of the right to a hearing; rather, Diehl never requested one.

Diehl cites no case holding that the requirement that the superior court hear the matter means an *oral* hearing, or that the court was required to hold an oral hearing in the absence of a request by him that it do so.  Instead, he relies on a decision discussing the right to oral argument on appeal, *Moles v. Regents of University of California* (1982) 32 Cal.3d 867.  However, that right, as the court recognized, is derived from the California Constitution and the Rules of Court and is specific to appeals.[9]  (*Id*. at pp. 871–872.)

---

[9]  The pertinent rule is now numbered 8.256 in the California Rules of Court.

26

Second, assuming for the sake of argument that the superior court erred by not holding an oral hearing, Diehl does not show he was prejudiced by it.  He fails to explain how any oral presentation he might have made in the superior court could have affected its review of the administrative record of the City's proceedings and decisions.  We see no possibility.  In short, Diehl's "no oral argument" argument fails.

## B.  Diehl's Motion to Supplement the Record

This same failure to show prejudice undermines Diehl's claim that the superior court's failure to rule on his motion to supplement the record with evidence of the written arguments he submitted at the February 21, 2012 City Council hearing could have affected that court's determination.

Diehl claims, in conclusory terms, that the superior court's failure to rule handicapped his efforts "to show that he did not receive a fair trial before the City Council of Crescent City."  Not so.  As the City explained in opposing the motion to supplement, Diehl submitted his written arguments at 4:16 p.m. on the day of the City Council's hearing, and they were not discovered by city employees until the next day.  These events do not show Diehl was deprived of a fair trial before the City Council.  If they show anything, it is that Diehl was dilatory.  Nothing in Diehl's proposed supplement suggests the City Council acted unfairly.  Therefore, Diehl can show no prejudice regarding this claim of error, either.

## C.  The Absence of a Statement of Decision

Diehl next argues that the superior court erred in failing to issue, on his request, a statement of decision.  We disagree for two reasons.

First, as Diehl recognizes, such a request is governed by Code of Civil Procedure section 632, which applies to a "trial of a question of fact by the court."  It is well established that a superior court's function in reviewing an agency decision under section 1094.5 where, as here, no fundamental right is at stake, is essentially appellate.  (*Stolman v. City of Los Angeles* (2003) 114 Cal.App.4th 916, 922 [in administrative mandamus action where no limited trial de novo is authorized by law, trial and appellate courts occupy identical positions, exercising appellate function of determining whether

27

the administrative record is free from legal error].)  Diehl cites no case holding that a statement of decision is required in this situation, and we are aware of none.[10]

Second, even if a statement of decision were required, Diehl again fails to show prejudice.  The absence of a statement of decision did not affect the superior court's decision, nor does it affect our own review, since our focus is on reviewing the City's decision, not the superior court's.

### D.  Diehl's Disqualification Motion

Diehl next argues that the superior court erred in denying as untimely the disqualification motion he filed after the superior court issued its decision.  This is meritless for three reasons.

First, denial of a disqualification motion is not an appealable order and may be reviewed only by a writ of mandate in this court.  (Code Civ. Proc., § 170.3, subd. (d).)  Second, Diehl's fails to establish error.  He claims the superior court's determination that his motion was untimely was error, but relies on an inapplicable California Rule of Court governing statements of decision.  (See footnote 9, *ante*.)  He concedes that he failed to file the motion until after judgment was entered against him but does not discuss whether it was timely under the statute that actually governs disqualification proceedings, Code of Civil Procedure section 170.3.  (See Code Civ. Proc., § 170.3, subds. (b)(4), (c)(1).)  Third, Diehl fails to demonstrate that his motion had any merit, that is, that he established that "[a] person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial."  (*Id*., § 170.1, subd. (a)(6)(A)(iii).)  The factual bases he asserted as grounds for the motion were that the court did not hold oral argument and did not rule on his motion to supplement the record or the City's objection to Diehl's late

---

[10]  Diehl's contention that the superior court was required to make findings similarly lacks merit.  The superior court's task was to review the City's findings for substantial evidence.  His arguments that the superior court was required to comply with the time limits prescribed by rule 3.1590 of the California Rules of Court, subdivisions (d) and (f) in issuing its decision and judgment is also without merit.  That rule, like Code of Civil Procedure section 632, applies only to decisions made after "trial on a question of fact by the court."  (Cal. Rules of Court, rule 3.1590(a).)

filed and unauthorized briefs. Even if he had shown that the denial of his motion as untimely was error (which he has not), he has failed to discuss why these "facts"[11] establish an appearance of bias and failed to cite any authorities supporting such an argument, and thus has not met his burden to show prejudice.

### E. The Proposed Form of Judgment

Last, Diehl argues he was denied due process because the superior court did not give him notice of the proposed form of judgment before entering it. The only argument he makes is that this deprived him of his opportunity to have his motion for disqualification, request for statement of decision, objections to the City's memorandum of costs and the City's objection to his briefs heard. But it is undisputed that the court gave notice to Diehl of the opinion, in which it directed the City to propose a form of judgment, and Diehl cites no statutory or other authority for his position that he was entitled to notice of the proposed form of decision before the court entered it. Nor does he cite or discuss any cases demonstrating that if there was error in this regard it amounted to a violation of due process. We therefore will not consider this argument further. (*Danser*, *supra*, 240 Cal.App.4th at p. 891.)

### III.

### *Diehl's Other Contentions of Superior Court Error Also Lack Merit.*

### A. Diehl Has Not Shown the City Deprived Him of Due Process.

---

[11] The superior court's opinion refers to the content of Diehl's briefs as presenting "many objections, some constitutional, regarding the cost assessed against him for a nuisance abatement" and making "long, detailed, scholarly arguments as to why the City's action was illegal." This shows the court considered the briefs Diehl submitted and implicitly denied the City's request that the court disregard them and, therefore, Diehl cannot even show error, much less any appearance of bias. Regarding the court's failure to hold oral argument, neither party requested one and even if the superior court erred in not holding one in this circumstance, it would not create an appearance of bias. Finally, the court's failure to explicitly rule on the motion to supplement fails to create an appearance of bias. The strong inference is that, for the reasons we have already discussed, the extra-record material Diehl sought to add was deemed immaterial to the superior court in determining that the City provided Diehl due process.

Diehl argues that the superior court wrongly found his due process rights in City proceedings were satisfied because he was provided notice and opportunity to be heard. He contends the hearings were not fair or impartial for several reasons: hearsay evidence was presented, irrelevant complaints about a fire hazard and invasive non-native vegetation were raised, City Council members in some instances had not read his entire briefs, and some members acted as "investigator" and "prosecutor" as well as adjudicator by, for example, driving by his properties and calling a code enforcement official in Washington to verify his allegations. He characterizes as "[p]erhaps the most egregious evidence of failing to provide a fair trial in 2012" the City Council's failure to read the brief and exhibits he presented and its reliance instead on their attorney's summary of and response to the points he raised.

Diehl has forfeited his due process argument by failing to cite or discuss any law, including the many cases that govern due process challenges to administrative proceedings. (*Danser*, *supra*, 240 Cal.App.4th at p. 891.) But even if we considered Diehl's argument, we would reject it.

"The ultimate determination whether an administrative proceeding was fundamentally fair is a question of law to be decided on appeal," which "we independently evaluate." (*Underground Contractors*, *supra*, 208 Cal.App.4th at p. 542.) "Due process is the opportunity to be heard at a meaningful time and in a meaningful manner. [Citation.] Unlike some legal rules, due process ' "is not a technical conception with a fixed content unrelated to time, place and circumstance." [Citation.]' [Citation.] Rather, it ' "is flexible and calls for such procedural protections as the particular situation demands." [Citation.]' [Citation.] Determining whether a particular administrative procedure is constitutionally sufficient requires analysis of the governmental and private interests involved: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used and any probable value of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative

30

burdens that the additional or substitute procedural requirement would entail." (*Id.*, at p. 543.)

As we have already held, the right at stake here was not in any sense fundamental. It could be characterized in many ways—the right to avoid having to be a good neighbor, the right to avoid the cost of maintaining one's urban properties, the right to be free of local property regulation all come to mind. But most charitably put and from Diehl's point of view, the interest he claims is that of allowing vegetation to grow unimpeded on property he owns and to leave that property in what he would describe as a "natural state." It is in part an economic interest of avoiding the cost of periodically cutting the vegetation and in part an aesthetic one in that Diehl believes the Properties are more attractive in the state of unimpeded growth than in any other state. The aesthetic interest is minimal, given that Diehl lives neither on nor anywhere near the Properties in question. The economic one, while not trivial, is modest.[12]

Further, Diehl was given notice and an opportunity to be heard, and there does not appear to have been any genuine dispute about the nature or amount of vegetation on the Properties; both the code enforcement officer and Diehl submitted photographic evidence. Rather there was disagreement about whether it met the criteria for a nuisance under the relevant local and state laws and whether various legal doctrines applied. Diehl did not appear at any of the hearings, but he submitted briefs and declarations which, when received by the City before the hearing, were considered.

True, the City relied on some hearsay evidence, but hearsay evidence is not per se inadmissible in administrative proceedings (see, e.g., Gov. Code, § 11513, subd. (d)), and Diehl waived any objection to its use of such evidence by failing to object. (See *Concord Communities, L.P. v. City of Concord* (2001) 91 Cal.App.4th 1407, 1417, fn. 1; 1 Cal. Administrative Mandamus (3d ed. Apr. 2016 update) § 6.72, p. 6-53.) Moreover, Diehl himself repeatedly presented hearsay evidence in support of his position, undermining his contention that the City's reliance on hearsay demonstrates the proceedings were unfair.

---

[12] The City's abatement cost for mowing, hauling and dumping years of unimpeded vegetation growth and trash accumulation was less than $1,000.

Diehl's complaints about the City not considering or inadequately considering his submissions do not demonstrate any unfairness either. As already discussed, he repeatedly submitted materials to the City by facsimile at the last minute, making it difficult and/or impossible for the City Council to review them before the hearing. The City Council members did consider them when they were received by the time of the hearing. Both the code enforcement officer Taylor and the City Council members mentioned Diehl's arguments at different points during the hearings, making it plain they had reviewed his papers, and they were advised by counsel that they were required to consider (but not necessarily accept) what Diehl said. Diehl has failed to show any unfairness in regard to the City Council's consideration of his arguments.

Finally, Diehl's arguments about some City Council members acting as "investigator" or "prosecutor" do not persuade us that the hearings were unfair and not impartial. The fact that a City Council member drove by the Properties to see them before the hearing and informed fellow members of his observations in this circumstance simply does not arise to the level of demonstrating a lack of impartiality. The fact that another City Council member made a telephone call to a code enforcement officer in Shelton, Washington after Diehl asserted in his submission to the City that his community preferred "natural landscaping," and was informed that it had a stricter nuisance ordinance than Crescent City's does not rise to the level of a due process violation. While the better practice for a government decision-making body would be to direct its investigators to conduct any further inquiry the decision makers desire to be done, this instance of a single City Council member making a phone call falls far short of demonstrating that Diehl did not receive due process.

**B. Diehl's Remaining Claims of Superior Court Error Lack Merit.**

Diehl's argument that the superior court failed to address critical issues is essentially a reprise of his argument that he was entitled to a statement of decision, which we have already rejected. His final argument is basically a substantial evidence challenge to the superior court's decision. As already noted, in reviewing a substantial evidence challenge in an appeal from a section 1094.5 writ, we decide the issue de novo, assessing

32

not the superior court decision, but the administrative agency (here the City's) decision. In any event, his challenge is unpersuasive. He claims there was no evidence to support the City's 2011 and 2012 determinations. As our discussion has indicated, there was ample and, essentially, unchallenged evidence to support them.

## DISPOSITION

The decision of the superior court is affirmed. Respondent shall recover its costs.

                                                _____

                                                STEWART, J.

We concur.

_____

RICHMAN, Acting P.J.

_____

MILLER, J.

*Clary v. City of Crescent City* (A143684)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JAMES RAYMOND CLARY, as Personal Representative, et al.,<br><br>     Plaintiffs and Appellants,<br><br>v.<br><br>CITY OF CRESCENT CITY,<br><br>     Defendant and Respondent. | A143684<br><br>(Del Norte County<br>Super. Ct. No. CVPT 111089)<br><br>**ORDER CERTIFYING OPINION FOR PUBLICATION** |

**THE COURT**:

The opinion in the above-entitled matter filed on March 30, 2017, was not certified for publication in the Official Reports. For good cause, the request for publication is granted.

Pursuant to California Rules of Court, rules 8.1120 and 8.1105(c)(2), (3) and (4), the opinion in the above-entitled matter is ordered certified for publication in the Official Reports.

Dated: _____          _____

                                                         Richman, Acting P.J.

Trial Court:   Del Norte County Superior Court

Trial Judge:   Hon. Leonard J. LaCasse

Counsel:

Steven R. Meeks for Plaintiffs and Appellants.

Black & Rice, Martha D. Rice, Robert N. Black, Autumn E. Luna for Defendant and Respondent.