Filed 4/24/19; Certified for Publication 5/16/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ANTHONY INZANA,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>TURLOCK IRRIGATION DISTRICT BOARD OF DIRECTORS,<br><br>    Defendant and Respondent. | F075810<br><br>(Super. Ct. No. 2014325)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County. Timothy W. Salter, Judge.

Kronick, Moskovitz, Tiedemann & Girard and Hanspeter Walter for Plaintiff and Appellant.

Griffith & Masuda, Roger K. Masuda and David L. Hobbs for Defendant and Respondent.

-ooOoo-

Turlock Irrigation District (TID) is an irrigation district formed and existing under the Irrigation District Law (Water Code, § 20500 et seq.),[1] which grants irrigation

---

[1] Undesignated statutory references are to the Water Code.

districts authority to "do any act necessary to furnish sufficient water in the district for any beneficial use." (§ 22075.)[2]

Anthony Inzana (Inzana), a landowner in the TID, planted over 160 pistachio trees within an easement Inzana's predecessor granted TID to construct a pipeline, and which gave TID the right of access to maintain the pipeline. TID gave Inzana notice that he must remove the trees, as they violated both the easement and TID's irrigation rule that prohibits certain encroachments being planted or placed within TID's conduits or rights-of-way. Inzana appealed the decision to TID's Board of Directors (Board), which upheld the tree removal order. When Inzana thereafter failed to remove the trees, TID refused to deliver water to Inzana's lands, which is a remedy provided TID under its irrigation rules.

Inzana filed a petition for writ of administrative mandamus, challenging both the tree removal order and the cessation of his water deliveries. The trial court denied the petition. On appeal, Inzana contends (1) the trial court applied the incorrect standard of review, (2) the tree removal order is inconsistent with the law and lacks evidentiary support, and (3) TID did not have the statutory authority to enact the irrigation rules under which TID denied him irrigation water. Finding no merit to Inzana's arguments, we affirm.

---

[2] This court previously gave "a brief overview of statutory enactments enabling and regulating irrigation districts" in *Turlock Irrigation District v. Hetrick* (1999) 71 Cal.App.4th 948, 951 (*Hetrick*). In 1887, the California Legislature enacted the Wright Act which gave irrigation districts the power to construct and maintain irrigation and drainage systems. Ten years later, the Wright-Bridgeford Act was passed, whose principal purpose " 'was to put water to agricultural use.' " (*Hetrick, supra,* 71 Cal.App.4th at p. 951.) That Act was amended in 1919 to permit irrigation districts to engage in the generation, distribution and sale of electricity. In 1943, a new set of enabling statutes known as the Irrigation District Law was enacted. (*Hetrick, supra,* 71 Cal.App.4th at p. 951.)

# FACTUAL AND PROCEDURAL BACKGROUND

In February 1988, the Board was granted 12.5 foot wide irrigation easements on three parcels of land located within Improvement District No. 103-C, known as the Crow-Grubb (the Crow-Grubb ID). The parcels had different owners – James Tomlinson owned Assessor Parcel No. 018-058-019 (Parcel 1), which was 59.13 acres, and Inzana and his wife owned Assessor Parcel No. 018-058-020 (Parcel 2), which was 97.35 acres adjacent to Parcel 1.[3] The Board accepted the grants of easements by resolution in March 1988, and the easements were recorded.

The easements granted "a right to construct, maintain, operate, and replace a pipeline and related structures thereon by said improvement district." In addition, the easement gave TID's "directors, agents, employees and contractors . . . the right to ingress to and egress from the above described easement for the purpose of operation, maintaining, repairing and keeping the pipeline and related structures in operating condition."[4]

Inzana and his wife purchased Parcel 1 in 2010. Inzana subsequently removed old almond trees that were on the parcel, some of which he claimed existed within the easement, and planted approximately 2,400 young pistachio trees in their place. About 169 of those trees were planted along Berkeley Avenue, within the 1.2 acre easement, approximately three feet from the pipeline's centerline.

### The Irrigation Rules

In 2003, TID enacted "Irrigation Rules," which were revised in 2005 and 2009. The preamble to the rules states, in part: "These rules are established pursuant to Water

---

[3] The third parcel, which had different owners, is not involved in this appeal.

[4] Inzana asserted in his petition that the concrete pipeline is located approximately three feet underground, and is about 24 to 30 inches in diameter, and two to three inches thick. Inzana further asserted the pipeline, which does not service his parcels, is a drain line that delivers drain water from upstream customers.

Code Section 22257 to ensure the orderly, efficient, and equitable distribution, use and conservation of the water resources of the District." Section 2.3.1 of the rules provides: "No trees, vines, shrubs, corrals, fences, or any other type of encroachment shall be planted, or placed in, on, over, or across any District or improvement district conduit or any District right-of-way unless the District has given specific written approval for such encroachment." (Rule 2.3.1.) Sections 2.3.2 and 2.3.3 give TID the right to remove, at the encroacher's expense, any unauthorized encroachment or encroachments on an improvement district right-of-way that interfere with the operation or maintenance of that facility.

Section 10.1 of the rules, entitled "Termination of District Water Delivery for Failure to Comply with Rules or Regulations" provides: "Failure or refusal of any landowner or irrigator to comply with any of these rules or applicable regulations ("rules and regulations") shall be sufficient grounds for terminating delivery of District water to the lands of such landowner or irrigator, and water shall not again be furnished until the landowner or irrigator is in full compliance with all rules and regulations." (Rule 10.1.)

***The Tree Removal Order***

On January 30, 2014, Brian Borum, a TID survey right-of-way manager, sent a letter to Inzana which stated, in part: "Your property located north of Service Road and east of Berkeley Avenue in Denair has an improvement district pipeline that runs parallel with Berkeley Avenue. Recently, it was brought to my attention that new trees have been planted within the ID 103C Crow-Grubb pipeline right-of-way which will eventually cause a maintenance issue and potential pipeline damage due to the trees being planted too close to the pipe." The letter cited section 2.3 of the Irrigation Rules concerning encroachments, and stated that TID "does not allow any trees to be planted within twelve (12) feet from the center of the pipeline." Borum asked Inzana to relocate any trees closer than 12 feet from the centerline within 60 days "to avoid maintenance and operation problems in the future." According to Mike Kavarian, TID's water distribution

4.

department manager, TID was concerned about trees planted within a pipeline easement because the growing tree roots eventually will impact the pipeline's integrity, causing it to crack, leading to flooding.

On July 9, 2014, Kavarian sent Inzana a "Notice and Order" demanding that Inzana remove the trees within the right-of-way on Parcel 1 (the tree removal order). Kavarian began by stating that Inzana was asked to relocate the trees in the January 2014 letter and, "[t]o date, the trees have not been relocated nor have we heard from you." Kavarian continued: "As stewards of the improvement district we believe the tree roots as well as the continuous farming of this row of trees within our right-of-way will prove to be detrimental to this section of the Crow-Grubb ID if allowed to remain within the right-of-way. Therefore, we are requesting within the next thirty (30) days the removal of the trees from the right-of-way. If the trees are not removed, the District will have the row of trees removed and you will be billed." Kavarian advised Inzana that he had the right to appeal the decision in writing within 10 days of the date of service of the tree removal order.

Inzana's attorney, Robert Fores, wrote TID on July 18, 2014, rejecting the request to remove the trees and appealing the tree removal order. Fores stated that Inzana never received the January 2014 letter and asked TID to provide the basis of its claim. Fores also asked to meet with TID to resolve the matter informally. TID tolled the appeals process several times so TID staff could meet with Inzana and Fores to attempt to resolve the issue.

On August 22, 2014, TID Civil Engineering Department Manager Brad Koehn, Kavarian and TID's attorney, Sara Lima, met with Inzana and Fores. At the meeting, Fores argued TID should have noticed much earlier than January 2014 that there were trees encroaching on TID's easement. In preparation for the meeting, TID staff discovered that TID already had recorded easements for the Crow-Grubb pipeline signed by Inzana and Tomlinson in February 1988. Lima mailed copies of the easements to

5.

Fores and informed him that TID agreed to toll the appeals process to September 15, 2014.

On September 26, 2014, Lima forwarded a copy of the title report TID obtained which showed the easement for the Crow-Grubb pipeline on Parcel 1. Lima explained it was irrelevant when the trees were planted because the trees posed "a liability to the Improvement District facilities of which TID is a steward," were planted in violation of TID's Irrigation Rules, and encroached on TID's recorded easement. TID offered to extend the time to remove the trees to October 17, 2014, to accommodate the harvest season, and requested a response by September 30, 2014.

Lima then received a call from Fores asking TID to consider entering into an indemnity agreement, by which Inzana would indemnify the improvement district and TID for any damages the trees might cause to the pipeline. Lima agreed to discuss the option with TID staff and extended the tolling date to October 17, 2014. Lima notified Fores by an October 14, 2014 letter that TID staff decided it was not in TID's best interest to pursue an indemnity agreement as TID "would like to prevent future problems from arising rather than fix problems after the fact." TID, however, would allow some flexibility in the date of removal to afford the trees the best chance of successful replanting.

On October 17, 2014, Lima received a letter from Fores, along with supplementary documents, in support of Inzana's appeal of the tree removal order. Fores asserted TID was estopped from requiring Inzana to remove the trees because TID knew he intended to plant them, but never objected to their placement in the easement. Fores detailed Inzana's claimed damages totaling $201,467.50. Fores also asserted it would be "patently unfair" for TID to remove the trees before actual damage or interference occurred, as it was not clear TID's rules were part of the easement and the easement did not prohibit Inzana from using the property as long as he did not interfere with the easement. Fores proposed that either the trees remain in place, with Inzana indemnifying

6.

TID for any actual damages that may occur to the pipeline, or Inzana would remove the trees if TID paid him the amount of claimed damages.

The appeal was submitted to TID's General Manager Casey Hashimoto on January 21, 2015. In denying the appeal eight days later, Hashimoto stated Inzana must comply with the tree removal order, and completely remove the trees from the easement, by March 1, 2015. If the trees were not removed by that date, TID reserved "the enforcement options available under Section 10 of the Irrigation Rules, including termination of water deliveries and removal of the trees at your expense."

***Inzana's Appeal to the Board and the Board's Decision***

Inzana appealed Hashimoto's decision to the Board on February 6, 2015. In his written appeal, Inzana's attorney, Fores, asserted the basis for the appeal was twofold. First, TID was seeking to impose rules and regulations on Inzana that were not part of the easement because they were not in place when the easement was granted. Second, TID was estopped from unilaterally requiring Inzana to remove the trees. Fores argued TID would be liable for inverse condemnation if it removed the trees without compensating Inzana.

The Board heard Inzana's appeal on February 24, 2015. In a power point presentation, TID stated the trees were planted approximately three feet from the pipeline and damage to the pipeline would cause serious problems. TID had seen pipeline damage from tree roots and, as a result, was trying to be proactive to try to prevent such damage by enforcing the irrigation rules regarding encroachments. TID asserted the easement granted TID the right to maintain the pipeline, and keeping the easement clear of trees and obstructions was a preventative maintenance measure to maintain the pipeline's integrity.

Fores presented the appeal for Inzana. He questioned the restriction regarding use of the easement and found it hard to believe TID was unaware of Inzana's intention to plant the trees. Fores felt the parties could reach a middle ground and encouraged a

7.

common sense approach without causing significant impact to Inzana's trees. Lima argued Inzana was aware of the easement rules when he granted the easement to TID, the easement and irrigation rules state the same requirements, there was no middle ground to be reached since leaving the trees in place potentially could damage the pipeline, and Inzana must comply with the irrigation rules to receive water from TID. After the hearing closed, the Board voted three to one, with one director absent, to deny the appeal.

On March 1, 2015, Lima wrote Fores to confirm the Board's decision. TID agreed to delay enforcement of the tree removal order until after March 20, 2015, to give Inzana time to move the trees. Lima said TID staff would mark the location of the easement for Inzana's convenience and TID reserved "all of the enforcement options available to it under the Irrigation Rules and applicable laws."

On March 13, 2015, Fores advised Lima that Inzana intended to appeal the Board's decision by way of a petition for writ of mandate. Fores asked TID to agree it would not seek to enforce the order, or withhold water due Inzana, during the pendency of the court proceedings. Four days later, Lima advised Fores that while TID staff agreed it would not remove the encroaching trees during the pendency of any proceeding on a petition for writ of mandate, it reserved the right to otherwise enforce the tree removal order, "including but not limited to the withholding of irrigation water in accordance with TID's Irrigation Rules for service."

On April 3, 2015, Kavarian sent a letter to Inzana and Fores stating that since Inzana refused to comply with the tree removal order, "the District hereby notifies you that in accordance with the Irrigation Rules, we will be placing holds" on Parcels 1 and 2, "and you will not be able to place irrigation water requests for those parcels. In addition, the District will lock the side gate at the canal so that the gate cannot be opened."

***The Petition for Writ of Administrative Mandamus***

Inzana filed a verified petition for writ of administrative mandamus in superior court under Code of Civil Procedure section 1094.5 on April 29, 2015. Inzana alleged he

8.

was seeking an alternative writ of administrative mandamus to: (1) set aside the Board's decision denying his appeal of the tree removal order; (2) enjoin the Board, and its staff and representatives, from refusing to provide his annual allotment of water; and (3) compel TID to remove the holds on Parcels 1 and 2, unlock the side gate at the canal without restriction so the gate can be fully opened, and allow him to receive his full allotment of water.

Inzana alleged the Board had not proceeded in the manner required by law, and its decision was not supported by the findings and evidence, as: (1) the easement does not give TID the authority to require removal of the trees; (2) the Board failed to comply with its own rules when it removed Inzana's water allotment without allowing him an appeal as provided in section 10.3 of the Irrigation Rules;[5] and (3) TID was aware for three years prior to issuing its tree removal order that he had planted trees within the easement yet failed to notify him of any encroachment, and trees had been planted and grown within the easement since it was established in 1988.

Inzana filed an ex parte application for issuance of an alternative writ commanding the Board to set aside its decision denying his appeal or to stay the implementation of the decision. In May 2015, the trial court ordered the Board to immediately remove "the holds" on Parcel 2 and the padlocks from the side gate, and allow immediate irrigation of Parcel 2, but otherwise denied the application.

The Board filed its answer to the petition on October 26, 2015. The Board admitted it refused to provide irrigation service to Inzana's properties due to his failure to

---

[5] Under section 10.3, entitled "Red Tags," the water distribution department manager may immediately terminate delivery of TID water to any parcel if the landowner fails to comply with a prior TID notice and order; notice of an immediate termination must be made by a "Notice and Order with a Red Tag." Section 10.6.3 provides that when such notice is issued with a red tag and water delivery is terminated, "a written appeal must be filed directly with the TID Board of Directors within ten (10) calendar days of the date of service of such Notice and Order or the person waives all rights to a hearing on the matter."

comply with the tree removal order, as well as the Irrigation Rules. The Board alleged that while irrigation service was restored to one parcel pursuant to the trial court's order, irrigation service to that parcel had since been terminated due to Inzana's repeated violations of the tree removal order and Irrigation Rules.

TID subsequently filed a separate lawsuit against Inzana and his wife for declaratory and injunctive relief in Stanislaus Superior Court case No. 2018190. The Inzanas filed an answer and cross-complaint, seeking a writ of mandate against the TID water termination order and a declaration that Rules 10.1, 10.3.1 and 10.3.2 are invalid. In addition, the Inzanas asserted violations of their constitutional rights. Inzana filed a motion to consolidate the two cases, which the trial court partially granted. The court kept each case as a distinct, separate case, with separate proceedings and judgments, but designated this case as the primary case, which would be heard first, and to the extent the court made relevant factual findings in this case, the court reserved the right to use those findings in the second case.

### The Statement of Decision

Inzana and the Board briefed the merits of the case.[6] Following oral argument, the trial court issued a statement of decision. The trial court rejected Inzana's contention that it should conduct a de novo review of the administrative record and exercise its independent judgment, as Inzana did not have a fundamental vested right to place trees within the easement. Accordingly, the trial court reviewed the Board's denial of Inzana's appeal for substantial evidence and found that, under the wording of the easement alone, substantial evidence supported the Board's decision affirming the tree removal order. With respect to the cut-off of Inzana's irrigation water, the trial court found section 22257 required TID to adopt rules for service to carry out its duties and allowed it to take steps to protect its property, and TID had a rational basis for adopting Rule 2.3.1.

---

[6] Inzana's opening and reply briefs are not in the appellate record.

10.

The trial court made express factual findings and the following conclusions of law: (1) under the 1988 easement, TID was granted the right of ingress and egress for the purpose of "operation, maintaining, repairing and keeping the pipeline and related structures in operating condition"; (2) Inzana's planting and maintaining the pistachio trees three feet from the pipeline constituted an encroachment which effectively denied TID the right of ingress and egress; (3) TID had a rational basis for enacting Rule 2.3.1; (4) Inzana violated, and remains in violation of Rule 2.3.1; and (4) under Rule 10.1, TID properly restricted irrigation water deliveries to Inzana. Accordingly, the trial court denied Inzana's petition.

Judgment subsequently was entered denying the petition for writ of administrative mandate and dissolving any prior stays or orders issued in the action.

## DISCUSSION

### I.     The Tree Removal Order

#### A.     Standard of Review Generally

The writ Inzana sought below is one of administrative mandamus governed by Code of Civil Procedure section 1094.5, by which he asked the court to set aside the Board's decision upholding the tree removal order and restore his water allotment to his two parcels. The scope of the trial court's inquiry under Code of Civil Procedure section 1094.5 was limited to whether the Board acted without or in excess of its jurisdiction, denied Inzana a fair trial, or abused its discretion in a manner that was prejudicial. (Code Civ. Proc., § 1094.5, subd. (b).) "Abuse of discretion is established if the agency 'has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.' " (*Clary v. City of Crescent City* (2017) 11 Cal.App.5th 274, 284 (*Clary*).)

When a petitioner contends the findings are not supported by the evidence in the administrative record, the standard of review in the trial court is either the substantial evidence or the independent judgment standard. (*Strumsky v. San Diego County*

11.

*Employees Retirement Assn.* (1974) 11 Cal.3d 28, 32.) Under the former standard, the trial court will affirm the administrative decision if it is supported by substantial evidence from a review of the entire record, resolving all reasonable doubts in favor of the findings and decision. (*Committee to Save Hollywoodland Specific Plan v. City of Los Angeles* (2008) 161 Cal.App.4th 1168, 1182.) Under this "deferential" standard, the trial court presumes the correctness of the administrative ruling. (*Patterson Flying Service v. California Dept. of Pesticide Regulation* (2008) 161 Cal.App.4th 411, 419.)[7] In contrast, where the independent judgment standard applies, the trial court exercises its independent judgment on the evidence in a limited trial de novo in which the court must examine the administrative record for errors of law and exercise its independent judgment on the evidence. (*Clary, supra,* 11 Cal.App.5th at p. 284.)

Where the trial court has reviewed the entire record and determined there was substantial evidence to support the administrative decision, the appellate court's "scope of review on appeal from such a judgment is identical to that of the trial court." (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 149 (*Bixby*).) We review the administrative record to determine whether substantial evidence supported the agency's findings, rather than limiting review to the trial court's findings. (*San Diego County Water Authority v. Metropolitan Water Dist. of Southern California* (2017) 12 Cal.App.5th 1124, 1145 (*San Diego*).) "This deferential standard requires us to presume the correctness of the administrative ruling, as all reasonable doubts must be resolved in favor of it." (*Ryan v. California Interscholastic Federation-San Diego Section* (2001) 94 Cal.App.4th 1048, 1077-1078.) Where the trial court has applied the independent judgment standard,

---

[7] "For this purpose, '. . . substantial evidence has been defined in two ways: first, as evidence of " ' "ponderable legal significance . . . reasonable in nature, credible, and of solid value" ' " [citation]; and second, as " 'relevant evidence that a reasonable mind might accept as adequate to support a conclusion' " ' " (*Desmond v. County of Contra Costa* (1993) 21 Cal.App.4th 330, 335.)

however, "an appellate court need only review the record to determine whether the trial court's findings are supported by substantial evidence." (*Bixby, supra,* 4 Cal.3d at p. 143, fn. 10.)

If the evidence is undisputed and not subject to conflicting inferences, or the administrative decision rests on an interpretation or application of a statute or ordinance, a question of law is presented for our independent review. (*MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 219; *Stermer v. Board of Dental Examiners* (2002) 95 Cal.App.4th 128, 132.) We are not bound by the trial court's statutory interpretation, which presents a question of law. (*San Diego, supra,* 12 Cal.App.5th at p. 1145.)

Inzana, as the petitioner, has the burden, both in the superior court and on appeal, to demonstrate the Board's decision was invalid and should be set aside, as we presume the Board regularly performed its official duty. (*Clary, supra,* 11 Cal.App.5th at p. 285.)

## B. Whether Independent Review Standard Applied

Here, the trial court applied the substantial evidence standard of review. Inzana contends this was error. He asserts he was entitled to the benefit of the trial court's independent judgment because the Board's decision affected a fundamental vested right. The trial court rejected this contention, as do we.

"[C]ourts must decide on a case-by-case basis whether an administrative decision substantially affects fundamental vested rights, and there is no fixed formula which guarantees a predictably exact ruling in each case. The essence of the determination is to protect the fundamental rights of the individual from abrogation without judicial, as opposed to administrative, review. . . . In analyzing the fundamental nature of the right, the court manifests slighter sensitivity to the preservation of purely economic privileges." (*San Marcos Mobilehome Park Owners' Assn. v. City of San Marcos* (1987) 192 Cal.App.3d 1492, 1499, citation & fn. omitted (*San Marcos*).) "An inquiry must be made . . . as to whether the property right at issue fundamentally affects the life situation

of the individual, or whether it merely impacts an area of economic privilege in a less than fundamental manner." (*Id*. at p. 1502.)

The right must not only be *fundamental,* but also *vested.* Thus, the court asks whether the right "is possessed by, and vested in, the individual or merely *sought* by him. In the latter case, since the administrative agency must engage in the delicate task of determining whether the individual qualifies for the sought right, the courts have deferred to the administrative expertise of the agency." (*Bixby, supra,* 4 Cal.3d at p. 144, italics added.) "Fundamental vested rights are often found in the context of public employment rights, licensing decisions, public assistance benefits and land use." (*Saraswati v. County of San Diego* (2011) 202 Cal.App.4th 917, 927.)

It is far less likely that a court will conclude a right is fundamental and vested where the matter "affects purely economic interests." (*JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1060.) Agency decisions that "result in restricting a property owner's return on his property, increasing the cost of doing business, or reducing profits are considered impacts on economic interests, rather than on fundamental vested rights." (*E.W.A.P., Inc. v. City of Los Angeles* (1997) 56 Cal.App.4th 310, 325.) Thus, for instance, the substantial evidence standard has been found to apply for review of agency decisions involving (1) the application of a nuisance ordinance resulting in the reduction of the hours of operation of an adult bookstore (*id.* at p. 325); (2) the required installation of a vapor recovery system to gasoline pumps that increased the cost of doing business (*Mobil Oil Corp. v. Superior Court* (1976) 59 Cal.App.3d 293, 305); (3) the shutdown of a fourth new oil refinery due to permit violations, resulting in a reduction in the company's profits (*Standard Oil Co. v. Feldstein* (1980) 105 Cal.App.3d 590, 603-606); (4) the denial of mobilehome park owners' rent increase requests under rent control laws (*San Marcos, supra,* 192 Cal.App.3d at p. 1502); (5) the New Motor Vehicle Board's decision upholding a manufacturer's termination of a dealership due to alleged breaches of a dealership

14.

agreement (*Kawasaki Motors Corp. v. Superior Court* (2000) 85 Cal.App.4th 200, 204); and (6) the denial of an application by an adult club featuring nude entertainment for a conditional use permit to sell alcohol (*SP Star Enterprises, Inc. v. City of Los Angeles* (2009) 173 Cal.App.4th 459, 470).

Inzana argues the Board's decision upholding the tree removal order affected his vested property right, namely the right to use his property for any use not precluded by the easement. (See, e.g., *City of Pasadena v. California-Michigan Land & Water Co.* (1941) 17 Cal.2d 576, 579 [when an easement is founded on a grant, only those interests expressed in the grant, and necessarily incident thereto, pass from the fee owner; "despite the granting of an easement, the owner of the servient tenement may make any use of the land that does not interfere unreasonably with the easement"].) Inzana asserts these rights are analogous to the revocation of an existing conditional use permit (CUP), which was found to constitute a decision substantially affecting fundamental vested rights in *Malibu Mountains Recreation, Inc. v. County of Los Angeles* (1998) 67 Cal.App.4th 359 (*Malibu Mountains*).

*Malibu Mountains* involved a mandamus proceeding by the property owner to review a decision of the Los Angeles County Board of Supervisors revoking a CUP to operate a tennis ranch, which was issued nearly 20 years earlier in favor of the owner's predecessor in title. (*Malibu Mountains, supra,* 67 Cal.App.4th at pp. 362-363.) The trial court upheld the revocation, finding there was substantial evidence to support the decision. (*Id.* at p. 366.) The appellate court concluded the trial court applied the wrong standard, holding "the grant of a CUP with subsequent reliance by the permittee creates a fundamental vested right that subjects a revocation to judicial review under the independent judgment test." (*Id.* at p. 368*; see id.* at p. 370.)

Here, unlike in *Malibu Mountains*, we are not dealing with the revocation of any right Inzana held. Instead, the Board's decision enforced TID's right, which Inzana's predecessor gave TID when granting the easement, to access the pipeline so TID could

15.

operate, maintain and repair it. As the trial court found, Inzana did not have a vested right to plant trees within the easement so as to interfere with TID's right of access. While Inzana complains the Board's decision resulted in a "*de facto* total ban on any farming and physical use" of his property, at most the decision resulted in restricting Inzana's "return on the property, a reduction in profits, or an increase in the cost of doing business" for which the substantial evidence standard applied. (*Breakzone Billiards v. City of Torrance* (2000) 81 Cal.App.4th 1205, 1244.) Inzana remains free to use the portion of his property subject to the easement for general farming or any non-interfering purpose.

We therefore conclude the Board's decision upholding the tree removal order was not an act that substantially affected fundamental vested rights under *Bixby, supra,* 4 Cal.3d 130. Consequently, the trial court did not err in applying the substantial evidence standard in its review of the administrative decision.

### C. Inzana Unreasonably Interfered With TID's Use of the Easement

In reviewing the Board's decision to uphold the tree removal order, we must determine whether substantial evidence exists in the administrative record to support the decision.[8] Inzana contends the Board abused its discretion in upholding the tree removal order because: (1) the Board relied on erroneous legal advice regarding the easement's terms; (2) to the extent the Board's decision was based on Rule 2.3.1, the Board had no authority to adopt that rule or impose it on him; and (3) to the extent the Board's decision

---

[8] Inzana devotes a section of his opening brief to addressing whether the trial court erred in finding that substantial evidence supported the Board's decision to affirm the tree removal order, and urges us to reverse the trial court's finding as not supported by substantial evidence. Since the trial court correctly conducted a substantial evidence review of the administrative record in upholding the Board's decision, however, our review is the same as the trial court's – we review the administrative record for substantial evidence to support the Board's, rather than the trial court's, decision.

16.

was based on a finding that his trees unreasonably interfered with the easement, that finding is not supported by the evidence.

We begin with the last contention, which depends on whether there is substantial evidence the trees Inzana planted within the easement unreasonably interfered with TID's use of the easement, namely its right to "construct, maintain, operate, and replace a pipeline and related structures" and its right to ingress and egress so TID could keep "the pipeline and related structures in operating condition."

" 'The rights and duties between the owner of an easement and the owner of the servient tenement . . . are correlative. Each is required to respect the rights of the other. Neither party can conduct activities or place obstructions on the property that unreasonably interfere with the other party's use of the property. In this respect, there are no absolute rules of conduct. The responsibility of each party to the other and the "reasonableness" of use of the property depends on the nature of the easement, its method of creation, and the facts and circumstances surrounding the transaction.' " (*Dolnikov v. Ekizian* (2013) 222 Cal.App.4th 419, 428-429 (*Dolnikov*).) In this case, therefore, Inzana cannot take any action that would unreasonably affect TID's ability to use the easement, and TID cannot use the easement in such a way as to unreasonably interfere with Inzana's use of his own property.

A servient tenement owner such as Inzana is " 'entitled to make all uses of the land that are not prohibited by the servitude and that do not interfere unreasonably with the uses authorized by the easement. . . . ' [Citation.] '[T]he servient owner may use his property in any manner not inconsistent with the easement so long as it does not *unreasonably impede* the dominant tenant in his rights.' [Citation.] '*Actions that make it more difficult to use an easement, that interfere with the ability to maintain and repair improvements built for its enjoyment, or that increase the risks attendant on exercise of rights created by the easement are prohibited . . . unless justified by needs of the servient estate.* In determining whether the holder of the servient estate has unreasonably

17.

interfered with exercise of an easement, the interests of the parties must be balanced to strike a *reasonable accommodation* that maximizes overall utility to the extent consistent with effectuating the purpose of the easement . . . and subject to any different conclusion based on the intent or expectations of the parties. . . .' (Rest.3d Property, Servitudes, § 4.9, com. c, p. 583, italics added.)" (*Dolnikov, supra,* 222 Cal.App.4th at pp. 429-430.)

" 'Whether a particular use by the servient owner of land subject to an easement is an unreasonable interference with the rights of the dominant owner is a question of fact for the trier of fact,' whose findings are binding upon the appellate court if properly supported by the evidence." (*Blackmore v. Powell* (2007) 150 Cal.App.4th 1593, 1599.)

Here, the evidence showed the trees interfered with TID's ability to maintain and repair the pipeline. The trees were planted three feet from the pipeline's centerline and bordered a country road. Photographs of the trees show that, while small, the trees would interfere with any trucks or equipment that might be used to maintain or repair the pipeline. Although there was unimpeded access to the pipeline from the road, the trees blocked similar access from the other side.

Moreover, because the trees were planted too close to the pipeline, eventually they would cause a maintenance issue and potentially damage the pipeline. Kavarian explained that when trees are planted within a pipeline easement, growing tree roots eventually will impact the pipeline's integrity, causing it to crack, leading to flooding. As stated in TID's power point presentation, TID had seen pipeline damage from tree roots, damage to this pipeline would cause serious problems, and keeping the easement clear of trees and obstructions was a preventative maintenance measure intended to maintain the pipeline's integrity.

Inzana points out there is no evidence the trees actually damaged the pipeline or interfered with TID's ability to access or maintain it. While it is true there is no evidence the trees actually prevented TID from being able to access the pipeline, it can be inferred from the trees' position that they would prevent such access. Although the trees had not

18.

caused any actual damage, leaving them in place interfered with TID's ability to limit damage caused by tree roots. Inzana asserts whether the trees would eventually damage the pipeline is "conjecture and surmise," as there is no evidence a pistachio tree, or any other type of tree, had ever damaged a pipeline like this one, or how often such damage had occurred. But such evidence was unnecessary, as TID's water distribution department manager stated that growing tree roots eventually will cause a pipeline to crack and will lead to flooding, and, as TID stated in its power point presentation, TID had seen pipeline damage from tree roots, and damage to this pipeline would cause serious problems. This was sufficient to establish the potential for problems should the trees remain in place.

Inzana contends the Board never balanced the parties' interest so as to "strike a *reasonable accommodation* that maximizes overall utility to the extent consistent with effectuating the purpose of the easement," as stated in *Dolnikov, supra,* 222 Cal.App.4th at pp. 429-430. The Board was presented with two options: (1) reach a middle ground which would not significantly impact the trees, presumably by entering into an indemnity agreement, as Inzana's attorney argued; or (2) remove the trees because they would potentially damage the pipeline and interfere with TID's access, as TID's attorney argued. In upholding the tree removal order, the Board impliedly engaged in the balancing Inzana now asserts it was required to do and determined a middle ground could not be reached, as the trees unreasonably interfered with TID's rights under the easement. It simply was not possible to reach a middle ground when the trees interfered with TID's right to ingress and egress, as well as its right to maintain the pipeline. While Inzana complains it is inequitable and unreasonable to deprive him of the use and benefit of his land merely to be proactive, Inzana's predecessor (and Inzana himself when he granted the same easement on Parcel 2) relinquished the right to complain when he granted the easement.

There is no merit to Inzana's argument the Board abused its discretion because it relied on erroneous legal advice regarding the easement's terms. Inzana asserts Lima misstated its terms when she told the Board at the hearing on his appeal that "the easement rules and the irrigation rules . . . state the same requirements," and "Inzana and two other landowners were granted the easement in 1988 which states the customer is to 'keep the easement clear of trees and obstructions as a preventative maintenance measure to maintain the integrity of the pipeline,' " as the easement does not contain express language prohibiting the planting of trees.[9] Citing to TID's power point presentation which stated that "[b]ecause the trees are planted in violation of both the Recorded Easement and the Irrigation Rule, staff recommends that this appeal be denied," he states the record shows this erroneous interpretation of the easement formed part of the basis for TID staff's recommendation to the Board. Even so, there is nothing to suggest the Board employed faulty reasoning in reaching its decision. It is enough that the Board's decision is supported by substantial evidence.

In sum, substantial evidence supports a finding that the trees unreasonably interfered with TID's rights to ingress and egress, as well as its right to maintain the pipeline. On this basis alone, the Board's decision must be upheld.[10]

---

[9] The full text of Lima's argument in the minutes of the Board's February 24, 2015 meeting reads: "TID's Assistant General Counsel Sara Lima stated Mr. Inzana was aware of the easement rules when he granted the easement to the District as it would have been on the title report. Though the easement rules and the irrigation rules are separate, they state the same requirements. Mr. Inzana and two other landowners were granted the easement in 1988 which states the customer is to 'keep the easement clear of trees and obstructions as a preventative maintenance measure to maintain the integrity of the pipeline.' Ms. Lima went on to say there is no middle ground to be reached since leaving the trees in place can potentially damage the pipeline and Mr. Inzana must comply with the irrigation rules to receive water from the District."

[10] Accordingly, we do not address, for purposes of reviewing the Board's decision upholding the tree removal order, Inzana's contention that the Board could not base its decision on a violation of Rule 2.3.1.

## II.     The Termination of Water Deliveries

Following the Board's decision to uphold the tree removal order, TID ceased delivering water to Inzana's two parcels under Rules 2.3.1 and 10.1.  Inzana contends TID did not have statutory authority to do so and seeks to invalidate Rules 2.3.1 and 10.1.[11]

TID established the Irrigation Rules pursuant to section 22257, which provides, in pertinent part, that "[e]ach district shall establish equitable rules for the distribution and use of water, which shall be printed in convenient form for distribution in the district."[12] The Irrigation Rules, like any agency action, come to the court presumptively valid. (*Association of California Insurance Companies v. Jones* (2017) 2 Cal.5th 376, 389

---

[11] In his petition, Inzana stated he was seeking a petition for writ of administrative mandamus under Code of Civil Procedure section 1094.5, which is the avenue for reviewing an administrative order or decision made as a result of an administrative hearing.  (Code Civ. Proc., § 1094.5, subd. (a).)  The decision to cut off Inzana's water, however, was not made as a result of an administrative hearing.  Instead, in challenging TID's decision to cease water deliveries, it appears Inzana is seeking a writ of mandate pursuant to Code of Civil Procedure section 1085, which is the avenue for compelling a public official to perform an official act required by law.  (*Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 442.)  We find it unnecessary to decide the appropriate avenue, however, because it does not affect our analysis.

[12] Section 22257 provides in its entirety:  "Each district shall establish equitable rules for the distribution and use of water, which shall be printed in convenient form for distribution in the district. A district may refuse to deliver water through a ditch which is not clean or not in suitable condition to prevent waste of water and may determine through which of two or more available ditches it will deliver water.  [¶]  A district may close a defective gate in a community water distribution system used for irrigation purposes and may refuse to deliver water through the defective gate if the landowner fails to repair the gate or outlet to the satisfaction of the district within a reasonable time after receipt of notice from the board through its authorized water superintendent, manager or ditch tender to repair the gate or outlet.  Rules and regulations adopted pursuant to this section may include, with respect to land for which there is no existing system for the application of water for the irrigation thereof, the limitation of the use of water for irrigation furnished by the district to an overhead sprinkling system where such method of irrigation will conserve water and prevent excess seepage or the creation of drainage problems."

(*Jones*).) Inzana contends Rules 2.3.1 and 10.1 fall outside the lawmaking authority the Legislature delegated to TID and conflict with the Irrigation District Law.

"These contentions implicate interpretation of the relevant statutes, which is a question of law on which this court exercises independent judgment. (*Jones*, *supra,* 2 Cal.5th at pp. 389-390.) "In exercising our ultimate responsibility to construe the statutory scheme, however, we ' " 'accord[] great weight and respect' " ' to the administrative agency's construction." (*Id*. at p. 390.) The weight we accord the agency's construction, however, depends on certain factors: (1) those relating to the agency's technical knowledge and expertise, which suggest the agency has a comparative interpretive advantage over a court; and (2) those relating to the care with which the interpretation was promulgated, which suggests the agency's interpretation is likely to be correct. (*Ibid.*) With these factors in mind, we retain ultimate responsibility to decide whether the rules fall within TID's discretionary rulemaking power. (*Ibid.*; *Association for Retarded Citizens v. Department of Developmental Services* (1985) 38 Cal.3d 384, 391 (*ARC*).)

A.      **Whether the Rules Exceeded the Authority Legislature Granted TID**

"It is well established that 'an irrigation district has only those powers granted to it under the enabling legislation.' " (*Consolidated Irrigation District v. City of Selma* (2012) 204 Cal.App.4th 187, 203; see *Imperial Irrigation District v. State Water Resources Control Bd.* (1990) 225 Cal.App.3d 548, 567 [" '[T]he powers of public [agencies] are derived from the statutes which create them and define their functions.' "].) The legislation defining the powers and purposes of irrigation districts is set forth in part 5 of division 11 of the Water Code. Irrigation districts may do any act "necessary to furnish sufficient water in the district for any beneficial use" and "put to any beneficial use any water under its control" (§§ 22075, 22076), and have "the power generally to perform all acts necessary to carry out fully" the Irrigation District Law (§ 22225). In addition to the powers expressly given, an irrigation district has such implied powers as

22.

are necessary to carry out the main purposes of the Irrigation District Law or the irrigation district.  (*Stimson v. Alessandro Irrigation Dist.* (1902) 135 Cal. 389, 393; *Bottoms v. Madera Irrigation District* (1925) 74 Cal.App. 681, 702 (*Bottoms*).)[13]

"Administrative action that is not authorized by, or is inconsistent with, acts of the Legislature is void."  (*ARC, supra,* 38 Cal.3d at p. 391.)  An agency's rulemaking authority "is circumscribed by the substantive provisions of the law governing the agency. . . .  [R]egulations that alter or amend the statute or enlarge or impair its scope are void."  (*Physicians & Surgeons Laboratories, Inc. v. Department of Health Services* (1992) 6 Cal.App.4th 968, 982.)

The Legislature conferred broad authority on TID to "establish equitable rules for the distribution and use of water," and to "make such reasonable regulations to secure distribution of water in accordance with determined rights as may be needed."  (§§ 22257, 22085.)  The issue here is whether the rules prohibiting any encroachment on TID conduits or rights-of-way (Rule 2.3.1), and allowing TID to terminate water delivery for failure to comply with such a rule (Rule 10.1), fall within TID's express or implied powers.

The purpose of the rule prohibiting encroachments on TID's conduits and rights-of-way is to prevent damage to conveyance facilities, and ensure TID has access to them, so water can be distributed without interruption.  While, as Inzana points out, Rule 2.3.1 does not directly involve the distribution and use of water, the rule allows TID to carry on those activities by protecting its facilities.  This is in consonance with TID's power to execute the various provisions of the Irrigation District Law "for the preservation of the District, for the protection of its properties, and for the distribution of water to the

---

[13] The term "necessary" in this context has been interpreted as meaning what "is convenient, useful or appropriate to accomplish the purposes of the district," which is "within the sound discretion of its governing authority."  (25 Ops.Cal.Atty.Gen. 164, 165-166.)

irrigable lands within the boundaries of the District." (*Bottoms, supra,* 74 Cal.App. at p. 701; see *Crawford v. Imperial Irrigation Dist.* (1927) 200 Cal. 318, 329 [under the irrigation law, the prime object and purpose of the irrigation district is to provide water for the use of its inhabitants and landowners; the law also confers "broad and comprehensive" powers on "the board of directors in order to enable them to accomplish this purpose"].)

We disagree with Inzana's contention that Rule 2.3.1 exceeded TID's rulemaking authority because it is directly contrary to section 22438.[14] That section grants an irrigation district which owns an easement for an open canal or other water conveyance facility that has no specified width a secondary easement[15] on each side of the canal or

---

[14] Section 22438 partly provides as follows:

"(a) A district which is the owner of an easement for an open canal or other water conveyance facility for the transportation of water across lands not owned by the district, other than an easement evidenced by a written grant or judgment providing a legal description of the easement, has a secondary easement on each side of the open canal or other water conveyance facility for the maintenance, repair, cleaning, operation, and control of the open canal or other water conveyance facility. . . . The duration of the secondary easement shall be for as long as the district . . . continues to own the open canal or other water conveyance facility easement regardless of what use has or has not been made of the secondary easement.

"(b) The owner . . . of the land upon which a secondary easement is located may use the surface of the land upon which the secondary easement is located for his or her own purposes to the extent that use does not unreasonably interfere with the district's ownership or use of the secondary easement or the open canal or other water conveyance facility easement. Any encroachment or obstruction placed or permitted upon the secondary easement by the owner . . . which unreasonably interferes with the secondary easement or the open canal or other water conveyance facility easement may be removed by the district at the owner's . . . expense, or by legal action filed by the district."

[15] Secondary easements, which are included in every easement, give the dominant owner " 'the right to do such things as are necessary for the full enjoyment of the easement itself.' " (*Dolnikov, supra,* 222 Cal.App.4th at p. 428.) Under the rule of reason, a dominant owner is allowed to exercise secondary easement rights " 'so long as the owner thereof uses reasonable care and does not increase the burden on or go beyond

24.

facility. (§ 22438, subd. (a).) The statute permits the landowner to use the surface of the land for the owner's own purposes to the extent that use does not unreasonably interfere with the district's ownership or use of the secondary easement, canal or facility, and allows the district to remove any encroachment which unreasonably interferes at the owner's expense or by legal action. (§ 22438, subd. (b).)

Inzana contends Rule 2.3.1 is directly contrary to section 22438 because the statute only prohibits use of the land that unreasonably interferes with the district's use of the secondary easement, while the rule purports to prohibit all encroachments on TID's conduits and rights-of-way regardless of whether the encroachment interferes with TID's use. This argument assumes, however, that the encroachments listed in Rule 2.3.1, namely "trees, vines, shrubs, corrals, fences, or other types of encroachments," do not unreasonably interfere with TID's use of its conduits or rights-of-way. It is apparent that the items on this list are the types of encroachments that would unreasonably interfere with TID's conduits and rights-of-way, as they would prevent TID easy access and ability to maintain the conduits and rights-of-way. For that reason, the rule is not contrary to the statute.[16]

TID also has the authority to promulgate a rule allowing it to terminate water deliveries for violations of its "equitable rules for the distribution and use of water." (§ 22257.) An irrigation district's ability to enforce its rules by terminating water deliveries is a tool in providing for the orderly distribution of irrigation water, and there is nothing inequitable in refusing to deliver water to landowners who refuse to comply with

the boundaries of the servient tenement, or make any material changes therein.' " (*Id.* at p. 429.)

[16] For this reason, Inzana's argument that Rule 2.3.1 imposed a greater burden on Parcel 1, as the servient tenement, than that imposed by the easement fails. Since the encroachments listed in Rule 2.3.1 naturally are ones that would unreasonably interfere with TID's use of the conduits and rights-of-way, they do not place a greater burden on Inzana's parcel than the easement itself.

the irrigation district's rules. To hold otherwise would require an irrigation district to bring an enforcement action whenever a landowner refuses to comply with one of the district's rules.

Inzana contends the grant of rulemaking authority should be construed more narrowly. He claims he has a protectable right to delivery of a share of TID's available irrigation water, which TID has a mandatory duty to serve him, as section 22250[17] requires irrigation districts to deliver a specific share of irrigation water to their landowners, which a landowner has a right to assign as provided in section 22251.[18] In support of his claimed vested right to irrigation water, he cites dicta in cases such as *Jenison v. Redfield* (1906) 149 Cal. 500, 503, in which our Supreme Court stated that a landowner has a "right" to the use of the water acquired by the district, and *Merchants' National Bank of San Diego v. Escondido Irrigation District* (1904) 144 Cal. 329, 334, in which the Court explained the irrigation district holds the district's property in trust and the beneficiaries are the landowners, in whom is "vested" the "right to the several use of a definite proportion" of the district's water.

Inzana further asserts Rule 10.1,[19] which allows TID to terminate water deliveries to a landowner who violates the Irrigation Rules, is contrary to section 22250 and related provisions of the Irrigation District Law, which establish and identify only a few limited exceptions to a landowner's right to receive irrigation water and give TID authority to

---

[17] Section 22250 provides: "All water distributed by districts for irrigation purposes shall except when otherwise provided in this article be apportioned ratably to each landowner upon the basis of the ratio which the last assessment against his land for district purposes bears to the whole sum assessed in the district for district purposes."

[18] Section 22251 provides: "Any landowner may assign for use within the district his right to the whole or any portion of the water apportioned to him pursuant to Section 22250."

[19] See page 4 for text of rule.

withhold irrigation water deliveries from its landowners.[20] He points out that section 22257 identifies particular circumstances when an irrigation district may refuse to deliver water, none of which apply to the easement dispute in this case. Based on his protected right to water and the Legislature's express exceptions to the exercise of that right, Inzana reasons the Legislature intended to limit the circumstances when an irrigation district may refuse water deliveries to its landowners to only those identified by statute. In essence, Inzana is arguing the Legislature reserved to itself the power to determine when an irrigation district may refuse to deliver water to one of its landowners. In Inzana's view, Rule 10.1 represents an unlawful expansion of TID's power by purporting to reach conduct not otherwise prohibited by the Legislature.

The contrast Inzana presents, however, is incomplete. While the Legislature did list certain situations when an irrigation district may refuse to deliver water, it would be wrong to conclude TID was thereby deprived of authority to expand that list, as long as it related to the powers granted to it. "Where, as here, the Legislature uses open-ended language that implicates policy choices of the sort the agency is empowered to make, a court may find the Legislature delegated the task of interpreting or elaborating on the statutory text to the administrative agency." (*Jones, supra,* 2 Cal.5th at p. 393.) The Legislature in the instant case used such open-ended language when it directed irrigation districts to "establish equitable rules for the distribution and use of water." (§ 22257.)

---

[20] These circumstances include: (1) water shortages (§ 22252.1); (2) when water supplies are limited, certain districts "may establish annual water requirements" for each type of crop grown in the district and may refuse to deliver water to the landowners who fail to adhere to these limits (§ 22252.3); (3) regulating the amount of water to be used to irrigate crops to prevent excess seepage or requiring the construction of adequate drainage facilities as a condition precedent to the delivery of water (§ 22255); and (4) when the district holds title to the land "by virtue of collector's deeds to the district" or the district "has an outstanding unredeemed certificate of sale for the nonpayment of a district assessment" (§ 22256).

As such, the Legislature left it to the irrigation districts themselves to enact rules, such as Rules 2.3.1 and 10.1, that relate to the power the Legislature gave them.

In sum, Rules 2.3.1 and 10.1 did not exceed the authority the Legislature granted TID.

### B.     Whether the Rules are Consistent with the Irrigation District Law

Having concluded Rules 2.3.1 and 10.1 fit within the lawmaking authority delegated by the Legislature, we now consider whether they are " 'consistent and not in conflict with' " Irrigation District Law and " 'reasonably necessary to effectuate the purpose of the statute.' " (*Jones, supra,* 2 Cal.5th at p. 396, citing Gov. Code, § 11342.2.)

There are two categories of administrative rules that require different degrees of deference by the courts – quasi-legislative and interpretative. (*Yamaha Corp. of America v. State Board of Equalization* (1998) 19 Cal.4th 1, 10 (*Yamaha*).) "Quasi-legislative rules represent 'an authentic form of substantive lawmaking' in which the Legislature has delegated to the agency a portion of its lawmaking power. [Citations.] Because such rules 'have the dignity of statutes,' a court's review of their validity is narrow: 'If satisfied that the rule in question lay within the lawmaking authority delegated by the Legislature, and that it is reasonably necessary to implement the purpose of the statute, judicial review is at an end.' " (*Jones, supra,* 2 Cal.5th at pp. 396-397, citing *Yamaha, supra,* 19 Cal.4th at pp. 10–11.) In determining whether the rule is reasonably necessary to effectuate the statute's purpose, the court's inquiry is confined to whether the rule is arbitrary, capricious, or without rational basis. (*Yamaha, supra,* 19 Cal.4th at p. 11 & fn. 4.)

An interpretative rule, however, is devoid of any quasi-legislative authority and represents the agency's understanding of the statute's meaning and effect. (*Jones, supra,* 2 Cal.5th at p. 397.) A court reviewing the validity of an interpretative rule must consider not only whether the rule is within the scope of the authority conferred and

28.

reasonably necessary to effectuate the statute's purpose, but also whether the administrative interpretation is a proper construction of the statute. (*Ibid.*) "In answering the latter question, the standard of review ' "is one in which the judiciary, although taking ultimate responsibility for the construction of the statute, accords great weight and respect to the administrative construction." ' " (*Ibid.*)

Here, Rules 2.3.1 and 10.1 are quasi-legislative rules, as TID adopted them pursuant to the Legislature's delegation of its lawmaking power. Therefore, we must determine whether these rules are reasonably necessary to effectuate the purpose of the Irrigation District Law, i.e. are they arbitrary, capricious, or without rational basis. We cannot say there is not a rational basis for either rule.

Rule 2.3.1 is designed to protect TID's right of ingress and egress so it can maintain its facilities, as well as to protect those facilities from damage caused by encroachments such as trees. As TID asserts, this rule is paramount for TID to be able to transport water district-wide. Such a rule is reasonably necessary to carry out the purpose of the Irrigation District Law, namely to protect TID's property and thereby ensure the equitable distribution of water. The ability to enforce irrigation rules, such as by terminating water deliveries, is also reasonably necessary to carry out this purpose. An irrigation district must have the ability to exercise its inherent discretion in applying rules for the safe and orderly distribution of services, and the protection of district irrigation and drainage infrastructure, by the only readily-available means, namely withholding such services, as opposed to filing a lawsuit for every violation. As such, Rule 10.1 does as much to provide for the orderly distribution of water as a rule governing the allocation of water.

Finally, Inzana contends TID abused its discretion when it denied him irrigation water because TID should have employed a less drastic remedy in response to the easement dispute, such as simply removing the trees itself or seeking a court order to do so, as provided for in section 22438. Inzana, however, ignores that he was the one who

29.

asked TID to refrain from removing the trees or withholding water during the pendency of these proceedings. TID agreed to not exercise self-help, but reserved its right to otherwise enforce the tree removal order, including withholding irrigation water in compliance with the Irrigation Rules. Moreover, section 22438 does not apply here, where the grant of easement provided a legal description of the easement. For these reasons, and because an irrigation district may refuse to deliver irrigation water to a landowner not complying with its rules of service, TID did not abuse its discretion in withholding Inzana's irrigation water.

## **DISPOSITION**

The judgment is affirmed. Costs on appeal are awarded to respondent.


_____
                                                                        SNAUFFER, J.

WE CONCUR:


_____
SMITH, Acting P.J.


_____
DESANTOS, J.


30.

Filed 5/16/19

**<u>CERTIFIED FOR PUBLICATION</u>**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ANTHONY INZANA,<br><br>    Plaintiff and Appellant,<br><br>       v.<br><br>TURLOCK IRRIGATION DISTRICT BOARD OF DIRECTORS,<br><br>    Defendant and Respondent. | F075810<br><br>(Super. Ct. No. 2014325)<br><br>**ORDER GRANTING REQUESTS FOR PUBLICATION** |

On May 10, 13, and 14, 2019, the Court received and filed requests for publication of the nonpublished opinion filed on April 24, 2019 in the above entitled matter. In that the opinion meets the standards for publication specified in the California Rules of Court, rule 8.1105(c), it is ordered that the opinion be certified for publication in the Official Reports.

.

_____
SNAUFFER, J.

WE CONCUR:


_____
SMITH, Acting P.J.


_____
DE SANTOS, J.