Filed 9/21/21  18131 Ventura Blvd v. 5223 Lindley CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

|  |  |
|---|---|
| 18131 VENTURA BLVD, LLC et al., | B304458 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. LC106325) |
| v. |  |
| 5223 LINDLEY, LLC, |  |
| Defendant and Respondent. |  |

APPEAL from a judgment of the Superior Court of Los Angeles County, Shirley K. Watkins, Judge.  Affirmed.

Law Office of Matthew Shayefar and Matthew Shayefar for Plaintiffs and Appellants.

Anderson, McPharlin & Conners and William R. Larr for Defendant and Respondent.

———————————————

18131 Ventura Blvd, LLC and Ventana Medical Center, LP (collectively Ventura) appeal from the judgment entered in favor of 5223 Lindley, LLC (Lindley). Following a bench trial the court found an easement over three feet of Lindley's property that had been granted by Lindley's predecessor to Ventura's predecessor did not exclude Lindley from having underground utilities in the easement area and Lindley's use did not unreasonably interfere with Ventura's enjoyment of the easement. Ventura argues the court's findings were contrary to the language of the contract and governing case law. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Easement*

This dispute concerns two parcels of commercial real property located in Tarzana: 18131 Ventura Boulevard (the Ventura property) and the adjoining property to the east, 5223 Lindley Avenue (the Lindley property).

In early 1989 the owners of the Lindley property executed an easement granting the owner of the Ventura property "an exclusive perpetual easement and right of way for the installation, construction, reconstruction, maintenance, repair, replacement, operation and use of one or more underground utility lines, including without limitation lines for sanitary and storm sewer, telephone, and gas transmission services, including all necessary and required appurtenances thereto, under, over and across the northerly three (3) feet of the Servient Tenement . . . ." The easement was recorded in July 1990.

2

2. *The Complaint*

18131 Ventura Blvd, LLC acquired the Ventura property in 2008.[1] Lindley acquired the Lindley property in 2012.[2]

In 2014 Ventura began development of the Ventura property into a medical office building and parking lot. During construction Ventura discovered there were underground utility lines servicing the Lindley property located above the Ventura drainage lines in the easement area. After Lindley refused to move its utility lines from the easement, Ventura commenced this action asserting claims for wrongful interference with an easement and nuisance.

---

[1] In 2017, after the dispute over the easement had arisen but six months before the complaint was filed in this case, 18131 Ventura Blvd executed a deed granting the Ventura property to Ventana Medical Center, LP.

[2] Despite their adversarial positions in this lawsuit the parties are owned and/or controlled by the same entity, Tristar Realty Group, LLC. Tristar Realty is the general partner of Hampton Real Estate Holdings LP, which is the managing member of 18131 Ventura Blvd. Tristar Realty is also the general partner of Ventana. Hampton Real Estate is the sole member of Lindley. Tristar Realty is jointly owned by Daniel Kashani and his father, with Daniel as the managing member. Daniel testified he and his father are the main decision makers regarding both the Ventura and Lindley properties.

It appears this litigation ensued because Daniel Kashani believes any judgment against Lindley should be covered by the title insurance policy Lindley purchased when it acquired the Lindley property. Accordingly, Lindley has tendered Ventura's claim in this action to Lindley's title insurer, and the insurer has provided a defense.

3

Ventura asserted the plain language of the grant of easement entitled it to exclusive use of the entire underground area in the northern three feet of the Lindley property. Because Lindley had refused to relocate its utilities, Ventura was unable to install a gravity-fed drainage system and instead had to install a more expensive pump-fed system. The complaint sought a declaratory judgment stating Ventura has the exclusive right to use the underground easement area, an injunction preventing Lindley from using the underground easement area and damages related to the installation of the more expensive drainage system and resulting diminution in value of the property.

3. *The Evidence at Trial*

a. *The grant of easement*

The properties at issue had originally been a single parcel owned by Safeway Stores, Inc., which, in 1957, split the parcel and sold the Lindley property. Safeway retained ownership of the Ventura property, which held one large building initially containing a grocery store and later an arts and crafts store.

By 1988 the Lindley property was owned by the Woelfl Family Trust, whose trustees were Rudolf and Hannelore Woelfl; and Rudolf Woelfl's sister, Johanna Pipes (collectively the Woelfls). The Woelfls demolished the building that had been on the Lindley property and built a new retail shopping center.

In early 1988, during construction of the new building, the Woelfl's contractor, Millard Boldman, discovered underground drainage and utility lines serving the Ventura property that ran underneath the Lindley property to Lindley Avenue. In April 1988 Boldman informed Safeway he would need to remove and replace its drainage and utility lines to complete construction

4

on the Lindley property, and in a letter to Safeway dated June 24, 1988 Boldman stated the work had been completed and the lines serving the Ventura property had been placed underground across the northern end of the Lindley property. The June 1988 letter also stated the Woelfls would grant an easement for these lines in exchange for Safeway's reimbursement of the cost incurred to remove and replace them (approximately $3,500).[3]

On August 22, 1988 Wylie Sheldon, the general counsel for the Safeway affiliate that managed the Ventura property, wrote to Boldman accepting the Weolfls' offer. The letter enclosed a proposed grant of easement and stated $3,500 would be paid after the document had been signed. The proposed grant of easement attached to the letter was substantially the same as the document ultimately executed. Sheldon testified he had no independent recollection of drafting the grant of easement but the notation in the footer of the document indicated it had been drafted by him.

Sheldon testified he generally had no recollection of the events surrounding the grant of easement. However, he stated his understanding of the term "exclusive easement" (both at the time and currently) "is that the owner of the servient tenement [the Lindley property] retains certain uses of the property . . . as long as it doesn't interfere with the rights of the owner of the dominant tenement [the Ventura property], and . . . the owner of

---

[3] The letter stated a proposed easement had been enclosed; however, the enclosure could not be located by the time of trial. None of the percipient witnesses who testified at trial could remember what the proposal had stated or how it had differed, if at all, from the executed grant of easement.

5

the servient tenement can't further grant to third parties any rights in the easement area."

Similarly, Rudolf Woelfl testified he had no detailed recollection regarding the grant of easement. However, he confirmed he had signed the notice of completion of construction for the Lindley property on October 20, 1988, which he testified would have meant all construction, including installation of any underground pipes or utility lines in the easement area, would have been completed as of that date. Accordingly, he explained, he would not have granted an easement that excluded the Lindley property's use of the easement area or grant any right that would have required him to move the utility lines already in place.[4]

b. *The dispute over the easement*

In 2014 Ventura initiated a development project on the Ventura property, which consisted of plans to demolish the existing building and replace it with a medical office building and parking structure. The initial plans included an underground gravity-fed storm drainage system from the east side of the Ventura property across the easement to Lindley Avenue, utilizing the existing four-inch drainage pipes that had been servicing the Ventura property. In early 2015, while conducting exploratory excavation in the easement area, Ventura's

---

[4]    Hannelore Woelfl testified she had no specific recollection of the grant of easement, but she stated she agreed in substance with her husband's testimony. The parties stipulated Pipes had been a silent partner in the ownership of the Lindley property, had no knowledge concerning the grant of easement and would have agreed to whatever action her brother had proposed.

contractors discovered there were underground utility lines servicing the Lindley property located above the Ventura property drainage lines. Ventura's engineer determined the Lindley property utilities would need to be relocated in order to install a gravity-fed drainage system in the easement area.

Robin Kashani, Daniel's brother and an employee of Tristar Realty, testified on behalf of Ventura. Robin stated he asked Daniel to relocate Lindley's utility lines and Daniel refused: "I advised him that [Lindley has] utilities in the way of [Ventura's] drainage system and in the easement area and requested that he remove them. . . . He said that he will not move them." After exploring several alternative drainage plans, it was determined that a gravity-fed system would not be possible without moving the Lindley utilities. Because Lindley would not agree to move the utilities, Ventura installed a pump-fed system that included the installation of four underground pipes above the Lindley utilities in the easement area.

4. *The Trial Court's Decision in Favor of Lindley*

Following a nine-day bench trial the court issued a 29-page statement of decision on November 15, 2019. The court rejected Ventura's argument the term "exclusive perpetual easement" meant Lindley was excluded from using the easement area. Instead, the court found the "term 'exclusive' is susceptible to multiple reasonable interpretations" and the "Grant of Easement is ambiguous as to the extent of the burden on the Lindley property." Accordingly, the court considered the extrinsic evidence regarding the parties' intent and historic use of the easement.

The court found credible Sheldon's and Woelfl's testimony their intent was to create an easement that would allow the

7

Lindley property to continue to use the easement area for its underground utilities.  The court further found Lindley was not unreasonable in refusing to remove its utilities because the "lines had been placed before the recordation of the easement and it was always intended that the easement area be shared."

Judgment was entered in favor of Lindley on December 27, 2019.

## DISCUSSION

### 1. *Governing Law and Standard of Review*

""""An easement is a restricted right to specific, limited, definable use or activity upon another's property, which right must be *less* than the right of ownership.""" (*Zissler v. Saville* (2018) 29 Cal.App.5th 630, 638.)  "In construing an instrument conveying an easement, the rules applicable to the construction of deeds generally apply.  If the language is clear and explicit in the conveyance, there is no occasion for the use of parol evidence to show the nature and extent of the rights acquired.  [Citations.]  If the language is ambiguous, extrinsic evidence may be used as an aid to interpretation unless such evidence imparts a meaning to which the instrument creating the easement is not reasonably susceptible." (*Scruby v. Vintage Grapevine, Inc.* (1995) 37 Cal.App.4th 697, 702 (*Scruby*).)

Whether an ambiguity exists is a question of law, subject to independent review on appeal.  (*Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1351.)  When there is no material conflict in the extrinsic evidence, the court interprets the contract as a matter of law.  (*City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 395; *Gilkyson v. Disney Enterprises, Inc.* (2021) 66 Cal.App.5th 900, 915; *Wolf v. Walt*

*Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1126.) If, however, there is a conflict in the extrinsic evidence, the conflict must be resolved by the fact finder, and we review those findings for substantial evidence. (*Wolf,* at p. 1127; *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1166 (*Winet*).)

2. *The Grant of Easement Does Not Exclude Lindley from Using the Easement Area*

a. *The language in the grant of easement is ambiguous*

Ventura argues the trial court erred as a matter of law in finding the term "exclusive" in the grant of easement to be ambiguous and argues "exclusive" can be interpreted only to mean that the Ventura property has the right to "exclusive use of the entire underground portion of the northerly three feet of the Servient Tenement." Lindley, on the other hand, argues "exclusive perpetual easement" as used here means no further easements will be granted but it does not exclude Lindley from use of the easement area. In other words, contrary to the way the parties and the trial court frame the issue, as used here the word "exclusive" itself is not really ambiguous—the parties agree the easement precludes *someone* from the easement area. The ambiguity arises from determining precisely what is modified by "exclusive"—whether the easement mandates *use* by the Ventura property alone or only prohibits any other *easement* from being granted. (Cf. *Gray v. McCormick* (2008) 167 Cal.App.4th 1019, 1025 (*Gray*) ["'The term "exclusive" used in the context of servitudes means the right to exclude others. The degree of exclusivity of the rights conferred by an easement . . . is highly variable and includes two aspects: who may be excluded and the uses or area from which they may be excluded. At one extreme,

the holder of the easement . . . has no right to exclude anyone from making any use that does not unreasonably interfere with the uses authorized by the servitude. . . . At the other extreme, the holder of the easement . . . has the right to exclude everyone, including the servient owner, from making any use of the land within the easement boundaries'"].)

An easement granting exclusive use to the dominant tenement, and thus entirely excluding the servient tenement's use, "is an unusual interest in land; it has been said to amount almost to a conveyance of the fee." (*City of Pasadena v. California-Michigan Land & Water Co.* (1941) 17 Cal.2d 576, 578-579 (*City of Pasadena*); see also *Gray, supra,* 167 Cal.App.4th at p. 1029 ["while exclusive easements that exclude even the owners of the servient tenement from the easement area may be less common than nonexclusive easements, they do nonetheless arise from time to time and have been held to be valid and enforceable under California law"].) Accordingly, "[t]he general rule is clearly established that, despite the granting of an easement, the owner of the servient tenement may make any use of the land that does not interfere unreasonably with the easement. [Citations.] It is not necessary for him to make any reservation to protect his interests in the land, for what he does not convey, he still retains." (*City of Pasadena*, at p. 579; see also *Gray*, at p. 1025; *Scruby, supra,* 37 Cal.App.4th at p. 702.) However, conveyance of an easement providing for the exclusive use by the grantee is possible where the grant of easement contains a "clear indication of such an intention." (*City of Pasadena*, at pp. 578-579 ["[n]o intention to convey such a complete interest can be imputed to the owner of the servient

10

tenement in the absence of a clear indication of such an intention"]; see also *Gray*, at p. 1025.)

Ventura relies on *Gray*, *supra*, 167 Cal.App.4th 1019, in support of its argument the use of the term "exclusive perpetual easement" in the grant of easement, without more, indicates a clear intent to exclude Lindley from using the easement area.[5]  In *Gray* the document creating the easement provided for "an exclusive easement of access, ingress and egress" over the McCormick property for the benefit of the Gray property.  (*Id.* at p. 1024.)  The document further stated the "'[u]se of the Easement by the Owner of [the Gray property] shall be exclusive.'"  (*Id.* at p. 1026.)  Finally, the writing provided the owner of the dominant tenement was responsible for improvement and maintenance of the easement area and would indemnify the owner of the servient tenement from liability in connection with the use of the easement.  (*Id.* at p. 1025.)

The court in *Gray* recognized the general rule stated in *City of Pasadena* that an easement granting exclusive use to the dominant tenement was rare.  (*Gray*, *supra*, 167 Cal.App.4th at

---

[5]    The trial court did not consider *Gray* in its analysis because it found that "case law distinguishes underground utility easements from surface easements, and establishes different and special rules for interpretation of underground utility easements. Accordingly, the Court will disregard case law pertaining to interpretation of the burden of a surface easement as inapposite in the present case."  While the circumstances surrounding the grant and use of underground and surface easements can certainly be distinguished from one another, there was no basis for the trial court's finding that "special rules of interpretation" apply to underground easements; and it erred in disregarding case law concerning surface easements.

11

p. 1025.)  However, the court found the repeated use of "language of exclusivity" and the statement that the "use" of the easement area shall be exclusive were sufficient to "clearly express[] the intention that the use of the easement area shall be exclusive to the owners of [the dominant tenement], in the sense of excluding all other owners of property in the subdivision, including [the servient tenement]."  (*Id.* at p. 1026.)  The court stated this interpretation was underscored by the indemnification and maintenance provisions, noting it would be "inconceivable" that the dominant tenement would be responsible to perform maintenance on an area that was being concurrently used by the servient tenement.  (*Ibid.*)

Contrary to Ventura's contentions, the language in the grant of easement in this case is not substantially similar to the language in *Gray*.  While the grant of easement here does convey an "exclusive perpetual easement," it does not contain additional language explicitly stating the use of the easement is to be exclusive or anything similar to the maintenance and indemnification provisions that indicated exclusive use in *Gray*.

In the absence of any language clearly identifying which parties were entitled to use the easement area, the grant of easement does not contain the clear indication of intent to exclude use by the servient tenement as required by *City of Pasadena*.  Accordingly, we find the grant of easement is ambiguous as to whether it provides for Ventura's exclusive *use* of the easement area or whether it provides it will be the exclusive *easement* to be granted by the servient tenement.

b. *Extrinsic evidence supports the interpretation that Lindley retained the right to use the easement area*

In interpreting an ambiguous grant of easement, relevant parol evidence includes the parties' discussions at the time the agreement was negotiated, "the circumstances which attended the making of the agreement, "'. . . including the object, nature and subject matter of the writing . . ." so that the court can "place itself in the same situation in which the parties found themselves at the time of contracting""" (*Winet*, *supra*, 4 Cal.App.4th at p. 1168) and the parties' "predispute, postcontracting conduct" (*Wolf v. Walt Disney Pictures & Television*, *supra*, 162 Cal.App.4th at p. 1133).[6]

The evidence here is not in conflict. Rudolf Woelfl testified construction on the Lindley property, including installation of the utilities in the easement area servicing the Lindley property, was completed by October 1988 when he signed the notice of completion. However, the grant of easement was not signed until 1989. If the grant of easement were interpreted to exclude the Lindley property's use of the easement area, then the Woelfls would have been in immediate breach of the grant of easement

---

[6]  To the extent the trial court relied on the Woelfls' and Sheldon's testimony regarding their uncommunicated subjective intent or understanding of the easement language, such reliance was improper. (*Zissler v. Saville, supra,* 29 Cal.App.5th at p. 644 [""'[t]he parties' undisclosed intent or understanding is irrelevant to contract interpretation""']; *Winet, supra,* 4 Cal.App.4th at p. 1166, fn. 3 [evidence of subjective intent "was not *competent* extrinsic evidence, because evidence of the undisclosed subjective intent of the parties is irrelevant to determining the meaning of contractual language"].)

from the moment they signed the document and would have been obligated to remove underground utilities they had only recently installed. Such an interpretation would be absurd. (See Civ. Code, § 1638 [contract to be interpreted consistent with contractual language and to avoid absurdity]; see also *Hill v. San Jose Family Housing Partners, LLC* (2011) 198 Cal.App.4th 764, 777 [easement must be interpreted to avoid absurdity].)

In addition, the amount of consideration paid for the easement suggests it was intended to permit use by the owners of the Lindley property. Safeway paid only $3,500 for use of the northern three feet of the Lindley property, whereas Lindley's appraisal expert testified the easement area would have been worth approximately $22,500 if sold as a fee simple in 1990. The fact that the Woelfls accepted a small percentage (less than 16 percent) of the land's value as consideration for the easement suggests they did not intend to relinquish their rights to use the property for underground utilities. (See *Concord & Bay Point Land Co. v. City of Concord* (1991) 229 Cal.App.3d 289, 294 ["[w]here an instrument is ambiguous as to whether a fee or easement was intended, the absence of monetary consideration or its nominal value suggests only an easement was intended"]; *Warren v. Atchison, T. & S. F. Ry. Co.* (1971) 19 Cal.App.3d 24, 35 ["[t]he fact that 'only a nominal monetary consideration was paid for the grant is a factor . . . indicating that the grant conveys an easement and not a limited fee'"]; see also *Gray, supra*, 167 Cal.App.4th at p. 1030 ["'[t]he amount of consideration paid for the interest conveyed is of considerable importance in construing the deed'"].)

14

### 3. *Substantial Evidence Supports the Finding Lindley Did Not Unreasonably Interfere with Ventura's Use of the Easement*

Having determined Ventura was not entitled to exclusive use of the underground easement area, the question remains whether Lindley's use was an unreasonable interference with Ventura's use of the easement. Where, as here, the owner of the servient tenement is permitted to simultaneously use the easement area, such use may not "'interfere unreasonably' with the easement's purpose." (*Scruby, supra,* 37 Cal.App.4th at pp. 702-703.) Likewise, "[t]he owner of the dominant tenement must use his or her easements and rights in such a way as to impose as slight a burden as possible on the servient tenement." (*Id.* at p. 702.) In other words, "[w]hen the easement is 'nonexclusive' the common users 'have to accommodate each other.'" (*Id.* at p. 703; accord, *Inzana v. Turlock Irrigation Dist. Bd. of Directors* (2019) 35 Cal.App.5th 429, 444-445 ["'The rights and duties between the owner of an easement and the owner of the servient tenement . . . are correlative. Each is required to respect the rights of the other. Neither party can conduct activities or place obstructions on the property that unreasonably interfere with the other party's use of the property'"].)

"'Whether a particular use by the servient owner of land subject to an easement is an unreasonable interference with the rights of the dominant owner is a question of fact for the trier of fact," whose findings are binding upon the appellate court if properly supported by the evidence.'" (*Inzana v. Turlock Irrigation Dist. Bd. of Directors, supra,* 35 Cal.App.5th at p. 445.) In determining whether the servient tenement's use is unreasonable, "'there are no absolute rules of conduct. The

15

responsibility of each party to the other and the "reasonableness" of use of the property depends on the nature of the easement, its method of creation, and the facts and circumstances surrounding the transaction.'" (*Dolnikov v. Ekizian* (2013) 222 Cal.App.4th 419, 429.)

As the trial court observed, while the grant stated the width of the easement was three feet, it did not specify the depth at which Ventura could place its utilities, the number of pipes that could be present or the permissible width of those pipes. Ventura argues the language allowing "one or more underground utility lines" demonstrates the parties' intent Ventura could place any number of pipes at any underground location in the easement area and could change the number or position of those pipes at any time. The Supreme Court, however, has rejected a substantially similar argument.

In *Winslow v. City of Vallejo* (1906) 148 Cal. 723 the City of Vallejo held an easement over Winslow's land for "any water-pipes or mains which may be laid by the city of Vallejo." (*Id.* at p. 724.) The language of the grant did not specify the location of the pipes other than that they must be at least one-and-a-half feet underground and as close to the "surveyed line" as possible. (*Id.* at p. 725.) At the time the easement was established, the City installed one 10-inch underground pipe through Winslow's land to carry water from a reservoir. Nine years later the City had grown such that the pipe was inadequate to meet the City's water needs. The City attempted to install an additional 14-inch pipe within three feet of the existing pipe. Winslow objected the second pipe would damage his orchard and was not permitted by the easement. The City argued the grant's use of the plural "pipes" and lack of limitation on location indicated an intent it

16

could install as many pipes on the land as it desired, limited only by the minimum depth and approximate location stated in the grant.

The Supreme Court disagreed, holding, because "the conveyance is general in its terms and affords no basis for determining the number of pipes, their size, or their exact location[,]" the City's initial use of the easement "in a particular course or manner, fixes the right and limits it to the particular course or manner in which it has been enjoyed." (*Winslow v. City of Vallejo*, *supra,* 148 Cal. at p. 725.) In other words, the Court stated, "[W]e see nothing in the language of this grant, or in the conditions existing when it was executed, to indicate that it was intended to give the defendant the right to increase from time to time the number of pipes laid. . . . [W]hile the city might, at the outset, have laid more than one pipe, . . . having elected to lay one, [the City] is bound by this election. . . . It is true, as urged by appellant, that the parties . . . may have contemplated that with the growth of the city, additional means of conducting water to it might be necessary. It by no means follows, however, that the grantors, in conveying a right of way for water-pipes over their land, intended to burden that land with an easement the extent of which could never be definitely ascertainable, and which might be enlarged again and again." (*Winslow,* at pp. 726-727; see also *Rye v. Tahoe Truckee Sierra Disposal Co., Inc.* (2013) 222 Cal.App.4th 84, 92-93 [easement granting right to use "portion" of the land for parking, storage and utilities did not entitle dominant tenement to use entirety of the easement area; dominant tenement limited to area it had historically used for parking and storage; because the grant "does not specify that all of the area is subject to the easement[,] . . . the precise area of use

17

must be inferred from the intention of the parties"]; *Scruby*, *supra*, 37 Cal.App.4th at p. 700 ["[N]onexclusive easement of a specified width does not, as a matter of law, give the owner of the dominant tenement the right to use every portion of the easement. . . .  [T]he owner of the servient tenement [has] the right to place improvements upon the easement as long as they do not unreasonably interfere with the right of the owner of the dominant tenement to ingress and egress"].)

Here, as in *Winslow,* the grant of easement was in general terms, allowing the Ventura property to use a three foot wide area of underground space to place utilities but not specifying the depth, width or number of pipes permitted.  The trial court reasonably inferred, based on the more than 20 years of use of the easement area, that the initial grant of easement was intended to permit the Ventura property to maintain its existing utility lines and add additional lines so long as they did not interfere with the Lindley property's existing usage.

In addition, the evidence supported the trial court's conclusion that Lindley's continued use of the easement was not unreasonable given that "there was still room in the easement for everyone to continue to share it . . . .  [P]laintiffs have the right to use the easement for its drainage and *are, in fact, using the easement for its drainage . . . .*"  In considering the nature of the easement, the facts surrounding its use and the competing interests of the parties, the court reasonably found Ventura was not entitled to disrupt Lindley's permitted use of the easement area after more than 20 years simply because Ventura wanted to change the nature of its drainage plan.  This is especially true where Lindley's existing use did not prevent Ventura from ultimately installing new drainage lines in the easement area.

18

(See *Scruby, supra,* 37 Cal.App.4th at p. 706 [substantial evidence supported trial court's finding servient tenement's placement of equipment in easement area did not unreasonably interfere with purpose of the easement where dominant tenement was still able to use remaining area for ingress and egress].)

## DISPOSITION

The judgment is affirmed.  Lindley is to recover its costs on appeal.


PERLUSS, P. J.


We concur:


SEGAL, J.


IBARRA, J.*


---

*     Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.